In the matter of the propounding for probate of a paper purporting to be the will of CAROLINE PEMBERTON, deceased, late of the county of Monmouth.

1. A will was sustained against the charge of undue influence by the principal legatee, where the testatrix appeared to have attended to all the details of having the will drawn and executed, and there was no evidence of such influence other than the testimony of witnesses as to testatrix's declarations.

2. An appeal will not lie from an order made by consent of the party appealing from it.

Appeals from the decree of the orphans court of the county of Monmouth admitting the will to probate, and an appeal from an order directing the administrator *pendente lite* to pay the counsel fees &c.

*Mr. W. H. Vredenburgh* and *Mr. A. C. Hartshorne,* for cave-
ators.

*Mr. G. C. Beekman,* for proponent.

THE ORDINARY.

Two of these appeals are by John P. Pemberton and Henry
H. Pemberton respectively, from the decree of the orphans court
admitting to probate a paper purporting to be the will of their
mother, Caroline Pemberton, deceased, and the other is by Caro-
line H. Pemberton, their sister, the proponent, from an order
made, according to its recital, on consent of her proctor and coun-
sel, directing that the administrator *pendente lite* pay the counsel
fees, and costs and expenses of the litigation, which the court had
decreed should be paid out of the estate. Motion is made to
dismiss that appeal.

That the testatrix was competent to make a will when the in-
strument in question which is propounded as her last will and
testament was executed, there can be no doubt. Indeed, her ca-
pacity is not questioned, but the caveators, her two sons, insist
that the proponent (who is her only daughter) procured the will
by the exercise of undue influence over her. The will was made
on the 16th of August, 1880, at Asbury Park, where the testa-
trix was then living with her daughter, who was keeping a board-
ing-house there. The testatrix died in London, England, No-
vember 20th, 1882, over two years afterwards. She went from
New York on a visit of pleasure to Europe, October 28th, 1882,
and died ten or twelve days after her arrival in London. She
was accompanied on the visit by the proponent, and Henry, one
of her sons. Both of the sons were and are physicians. Up to
the time of her death they were not aware that she had made this
will. According to their testimony, both of them were desirous
that she should make a will before she sailed, and spoke to her
on the subject, and it appears, by Henry's testimony, that he was
desirous that she should do so up to the time of her death. By
the will, she gave to John mortgages to the amount of $1,200
(of principal); to Henry mortgages to the amount of $1,962 (of

principal), and to Caroline two lots of land in Long Branch, adjoining each other, and a mortgage of the amount of $650 (of principal), and also her building loan shares and bank stock, together with all the residue of her personal estate. To Caroline's son she gave two lots of land in Ocean township, Monmouth county, and to John's daughter a lot in Eatontown township in that county, and she appointed Caroline her executrix. The will was executed with all due legal formalities.

The attempt made to discredit it by endeavoring to show that the name of one of the three witnesses was added after the execution, and that alterations were made in the instrument after it was signed, by correcting sundry mistakes in the Christian name of the proponent and adding a note that those alterations and another were made before execution, was unsuccessful. The testatrix herself gave the instructions for the will to the lawyer by whom it was drawn, either on the same day on which it was executed or the day before, at his office, to which she went alone for the purpose, and she also brought to him, at his request, her deeds and mortgages, the former in order that from them he might describe the real estate to be devised, and the latter that he might describe them in the will. She told him that she wanted him to be very particular about the will because her sons, both of them, had threatened that if she ever made a will they would contest it ; that she did not know on what grounds they intended to contest it except that one of them had told her that she was not capable of making a will, and that he would " fight it " on that ground. She was therefore desirous that the witnesses should be persons competent to testify to her competency, and, at her suggestion, two physicians were got. One was Dr. Mitchell, of Asbury Park, whom she herself suggested because he was the physcian employed at her daughter's boarding-house, where she lived. The lawyer proposed to get as another Dr. Johnson, also of Asbury Park, but she objected to him on the ground that she thought that he and her sons were intimate friends, and she did not want to cause hard feeling between him and them. The lawyer then selected Dr. Kinmouth, of Asbury Park, and Drs. Mitchell and Kinmouth and Mr. Stout, the lawyer, witnessed her execution

of the will.   It was signed at the house in which she lived, and
in the evening.   There appears to have been no attempt or dis-
position to keep either the fact of the execution of the will or·
its contents secret.   Mr. Stout testifies that it was read by him
to her in the presence of Drs. Mitchell and Kinmouth before it
was signed.   He says he asked her whether she objected to its
being read in their presence and she replied no, that it had better·
be read in their presence, and he says that he read it to her while·
they, Drs. Kinmouth and Mitchell, sat talking to each other.   It
was delivered to her by Mr. Stout immediately after its execu--
tion.   The proponent's son says that she delivered it to him (her·
grandson) for safe-keeping at his mother's house in Asbury Park
on the 1st day of October, 1882, telling him to keep it safe, that
she had protected his mother in it and that she, the testatrix,
was going to Europe.   He went to the city of New York the·
next day to reside there and kept the will in his possession in his
trunk until about the 23d day of November following, when it.
appears that, having heard from his uncle, John P. Pemberton,.
of the death of the testatrix, he rented a box in the vault of a
safe deposit company in that city and deposited it there, where it
was kept until it was taken out for the purpose of propounding·
it for probate.

As before stated, the caveators insist that the will was the re--
sult of undue influence exerted over the testatrix by the proponent,.
with whom she lived for the last years of her life.   The testa-
trix was a widow (her husband died in 1875), and when the will·
was made she was about seventy years old.   Her son Henry
was a bachelor, and her other son was married and had a family.
It was quite natural that she should live with her daughter, who,
though she had been married, had married unfortunately and had
been divorced ·from her husband.   By him she had had one·
child, the son before mentioned.   It is not surprising that in dis-
posing of her property by will the testatrix should give the
greater part of it to her daughter, who was dependent for her·
support on her own labor and kept a boarding-house as a means·
of gaining a livelihood.

Between the mother and the daughter the most affectionate·

relations appear to have existed, and the daughter gave to the
mother the kindest attention. It is urged by the caveators that
the proponent influenced her mother to make the will in her
favor, because of her desire to aggrandize herself and because
of her hatred to her brothers, whom she desired to deprive of
their shares of the property of their mother. In the latter part
of July, 1880, (the will was made on the 16th of August fol-
lowing) Caroline's son (Charles), who then lived with her at
Asbury Park, was sent by her and the testatrix from that place
to Long Branch to pay some money for the former and to make
a deposit in the bank for the latter, and to that end was intrusted
with money belonging to his mother and bank checks belonging
to the testatrix. He absconded, taking the money and checks
with him. His mother at first thought that he had been robbed
and murdered. Her brothers were of opinion that he had
run away. They disliked him, and expressed opinions and
made remarks very derogatory to him upon that occasion. She
was very indignant at this and complained bitterly of them, and
inveighed strongly against what she seemed to regard as their
injustice towards him and their want of sympathy with her, and
threatened that she would be revenged upon them, that she
would "get square" or "get even with them" for their conduct
towards him and her. She indeed denies that she made those
threats, but they are sworn to by several disinterested witnesses.
There is evidence that she urged her mother to make a will.
The witnesses who testify on this point are Mary Williams,
Georgianna Lucas, John P. Pemberton and Caroline M. Pem-
berton, his wife, Jane Schreeve and Catharine Johns, all
witnesses produced by the caveators. The first-named, Mary
Williams, who was a servant of the proponent in the summer
of 1880, testifies that at the time Charles went away, the propo-
nent said, in her presence in the kitchen of the proponent's house,
that she had been after her mother to make a will and she
would not do it; and she added that she did not know what
might happen; that now she would be there a lone woman, left
alone if anything should happen. She further says that about.

a week, or perhaps longer, after Charles went away, she heard the proponent talking to her mother about a will; that she said:

" Mamma, you ought to make a will; indeed, mamma, you ought to make a will."

She says the testatrix replied:

" Carrie, don't bother me so about it; don't worry so much about the will."

And again she says she heard the proponent say to one of her boarders that she had been at her mother to make a will and that " mamma did not seem to want to do it." It will be seen that in all this there is no evidence of any effort on the part of the proponent to induce her mother to make her will in any particular way, but only to make a will; and it would appear that her mother was quite able to determine for herself what she ought to do in the matter, and resisted her importunities. Georgianna Lucas, who also was a servant of the proponent in the summer of 1880, says that she heard the proponent say that she had often been at her mother to make a will, for she did not know what might happen. She also says that she heard the testatrix say that the proponent was always worrying her about the will, but she adds that the testatrix said nothing more. John P. Pemberton (one of the caveators) and his wife testify that the testatrix said that the proponent wanted her to make a will to protect her against her brothers. Catharine Johns says that the testatrix told her on the 10th of August, 1880, that the proponent was in a dreadful state of mind; that she threatened to drown herself in the ocean if the testatrix did not make a will in her favor. She also says that the testatrix said that in order to have peace she would have to make a will in favor of the proponent, until the matter (in regard to Charles's departure) had blown over, and then she could or would destroy it. She says that afterwards she talked to the testatrix again on the subject, and that the testatrix, in reply to a question from her, told her that she had made a will but very much against her will or wishes. The witness says that she (the witness) then remarked that she (the testatrix) could destroy it as she liked; to which the testatrix replied no; that

Carrie would never be satisfied unless she carried it herself, and gave as a reason that Carrie thought that her brothers would get it away if the testatrix kept it. She says that in that conversation the testatrix said she did not see why Carrie should want all the property; that she (the testatrix) did not intend to leave a will; that she never intended to make one; that she intended that her children should share alike; that the property should be equally divided. She further says that in 1881 the testatrix told her she had got the will from Carrie, but with a great deal of difficulty, and had destroyed it, and asked the witness if she did not think she was fortunate in getting it from Carrie. Jane Schreeve testifies that the testatrix told her that Carrie desired and worried her to make a will, for she did know what might happen, and she says the testatrix also said that she had made the will very much against her wishes, but in order that she might have peace. She also says that in the latter part of the season of 1880 the testatrix told her she was sorry she had made a will, and in 1881 she told her that she had made it but intended to get it and destroy it, for she had lost her brother recently, and they were "well enough fixed; that one child was just as near as the other and she wanted it to be her will." She says the testatrix added "let it be much or little, but let it be divided equally between them." She also says that in 1881 the testatrix told her that she had succeeded in getting the will and had partly destroyed it and was going to destroy it. She says the testatrix got the will; that it was torn; that it looked like several leaves of paper; that there were two or three—two, certainly, if not more, large leaves; that it had a red stamp (seal) upon it, apparently about the size of a half-dollar; that she (the testatrix) said, "ain't it a blessing that I got it;" that the witness said "why don't you burn it up?" and the testatrix replied that that was what she would do. She further says that just at that time the proponent was coming in and the testatrix twisted up the paper and put it in her pocket, and nothing more was said about it; that the testatrix opened the paper and showed it to her (the witness), and said that will be the end of it; that one child was as near to her as the other, and she wanted it equally divided.

She testifies that the paper was torn; that it looked as though it had been twisted up, and she (the testatrix) straightened it out. She says, also, that the paper propounded for probate is not the paper, because the paper which she saw was all wrinkled and was somewhat torn near the place where the red seal was; that part of the seal was torn off, and that the testatrix said she had partly destroyed the paper. The reason which this witness says the testatrix gave for destroying the will was not that the will had been obtained by undue pressure, or was unjust when made, but that the fortunes of her children had been improved by the death of her brother, and that through his death they had become rich enough. In point of fact, nothing had been left to the children by their uncle, or had come to them from him or through his death. Again, she says that the testatrix showed her the will she had made, and that it was partly destroyed. But the will which the testatrix made on the 16th of August, 1880, is produced in court and has no mark of cancellation, nor is it torn or wrinkled. Moreover, the witness says that that is not the paper which the testatrix showed her, and it cannot be the paper to which she referred in her conversations with this witness and Mrs. Johns.

There is evidence in the testimony of Daniel H. Webster, another witness on the part of the caveators, that the testatrix deliberately designed, in making what she considered a just disposition among her three children, to give to the proponent the real property devised to her by the will, the giving of which to her makes the greater part of the inequality complained of by the caveators. He says that the testatrix said about two weeks after Charles's flight, in the presence of Mrs. Schreeve and himself, that she expected to divide equally among her three children what little she had accumulated; that she expected to see them all righted; that the property on the corner of Chelsea and Third avenues would be enough for Carrie so long as she lived; and that her, the testatrix's son, John had been wronged in the property (this is said to refer to the disposition of his father's estate), and she wanted to see him righted. It does not appear how her purpose to do justice to John as between him and his brother and

sister would be effected by an equal division of her property among them. Nor, it may be remarked, does it appear by the evidence whether John and Henry had not received money from her which they still owed her, and which she took into account in making her will. But, however that may be, it is clear from the testimony of Webster (and it is not contradicted, although, as before stated, Mrs. Schreeve was a witness for the caveators) that the testatrix deemed it but just in her disposition of her property, by will, to give that real estate to the proponent. Nor does it appear that the proponent, by her violent denunciations of her brothers for their conduct towards her in respect to her son, influenced her mother against them. Mrs. Johns says that she heard a letter from Henry to his mother, dated July 29th, 1880, read by the proponent to the latter. It contained violent denunciations against both the proponent and her son. Mrs. Johns says that when the letter had been read, the proponent said : "You see, mother, what they do and how they act;" and the testatrix replied that the proponent was always finding fault with her brothers; that she, the testatrix, did not know but what they were right. Again, it appears by the will itself that the testatrix, when the will was made, believed as her sons did, that Charles had not been murdered, but had absconded; for she makes a devise to him by the will and gives no intimation that she entertained a doubt that he was alive. The declarations of the testatrix, whether made before or after the execution of the will, respecting the conduct of the proponent towards her, are not competent evidence of undue influence. *Rusling* v. *Rusling,* *9 Stew. Eq. 603.* Nor would the declarations which she is said to have made, that she had no will and intended to divide her property among her children equally, be competent to show that she did not make the will in question. *Boylan* ads. *Meeker, 4 Dutch. 274.* It is not denied, however, that she did make the will. Her declarations as to the disposition which she intended to make of her property, to leave it among her children in equal shares, are not evidence of undue influence. *Boylan* ads. *Meeker, ubi supra.* There is no evidence apart from the declarations of the testatrix that the proponent exerted any influence

over her to induce her to make a will to favor her more than her
brothers. And the witnesses Catharine Johns and Jane Schreeve,
who testify to those declarations, while they say that the testa-
trix told them that she had made a will to satisfy the proponent,
say, also, that she said she had destroyed it; and the latter says
she showed her the paper, and that it was then partially destroyed.
This evidence, if competent, would be entitled to no weight, for
there is no evidence that the testatrix ever made any other will
than the one under consideration, and there can be no doubt that
she was of sound mind at the time when these witnesses say she
made those statements. In the fall of 1881, she made a contract
for the building of a cottage in Asbury Park, which was built
for her accordingly, and in her transactions with the builder, she
showed full business capacity. Henry H. Pemberton says she
generally attended to her own money matters, and it appears
from his testimony that when she was about to leave for Europe,
he wanted her to endorse two notes as renewals of one she had
endorsed for his accommodation, and which would mature during
her absence.

John also got a note of $600 from her at the same time, for
which he obtained the money to pay the expenses of his daugh-
ter's then contemplated trip to Europe with her. Henry and
his brother regarded her as having testamentary capacity up to
the time when she left for Europe, and the former seems to
have considered her competent to make a will up to the very
hour of her death. Apart from what is testified to by the
witnesses Schreeve and Johns (and that testimony which
consists of her declarations, is, as before stated, not competent),
there is no evidence of undue influence, and, according to their
testimony, the testatrix was quite able to resist any influence
which the proponent attempted to bring to bear upon her. Not
only does it not appear that the proponent in fact influenced the
testatrix against her sons, but it appears that the feelings of the
testatrix were kindly towards them up to the last. She paid
Henry's expenses of the trip to Europe, and lent her note to
John to raise money to pay his daughter's expenses of that trip.
The daughter, however, was prevented from going by the propo-

nent's unwillingness to have the care of her. There is no evidence that the proponent took any part in the making of the will in question. The instructions were, as before stated, given by the testatrix herself in her lawyer's office, to which she went alone for the purpose, and she herself brought her deeds and mortgages to the lawyer at his request (again going alone) to enable him to draw the will. She instructed and consulted with him as to the witnesses, and gave her reasons for her desire to have physicians as witnesses, and in this connection it is noteworthy that in her conversations with Mr. Stout on the subject, she gave as her reason for exercising care in the execution of the will, her apprehension that her sons would contest it, and that apprehension was induced, not by what others had told her, but what they themselves had said to her. She herself attended to the paying of the lawyer for his services for drawing the will and superintending its execution. She objected to the amount of his charge, and induced him to accept less for his services. After the will was made, she built, at a cost of about $10,000, the house in Asbury Park. She died intestate of that and another property at Long Branch, called the Lloyd property. It does not appear when or how she acquired the latter. She received the money for some of the mortgages bequeathed by the will and pledged the others, together with the building loan and bank stock, as security for her note for $2,500, given to raise money to pay the expenses of the trip to Europe. She appears to have had full control over her property and to have dealt with it accordingly.

The decree admitting the will to probate should be affirmed. There will be an allowance of $100 to the counsel of each of the caveators and of a like fee to the counsel of the proponent, for their services in this court, payable out of the estate, and the costs of this appeal on both sides will also be paid out of the estate.

The appeal of the proponent from the order directing the administrator *pendente lite* to pay the counsel fees and costs, and expenses in the orphans court, will be dismissed, with costs. It

appears by the petition of appeal, as well as by the transcript, that that order was made by consent of the proponent's proctor. An appeal will not lie from an order made by consent of the party appealing from it.