JOHN J. WINBERRY, PLAINTIFF-APPELLANT, v. W. BUR-
TON SALISBURY, DEFENDANT-RESPONDENT.

Argued June 19, 1950—Decided June 27, 1950.

242

*Mr. Frank G. Schlosser* argued the cause for the appellant (*Messrs. O'Regan & Schlosser,* attorneys).

*Mr. Theodore D. Parsons,* Attorney General, argued the cause for the respondent (*Mr. Warren Dixon, Jr.,* Deputy Attorney General, and *Mr. Joseph A. Murphy,* Assistant Deputy Attorney General, on the brief).

The opinion of the court was delivered by

VANDERBILT, C. J. The plaintiff brought suit in the Superior Court to expunge an alleged libel on him from a report

of a grand jury on file with the county clerk of Middlesex County. The defendant Salisbury moved for summary judgment on the ground, among others, that the complaint did not state a cause of action and his motion was granted on May 25, 1949. On June 11th the trial court of its own motion modified the order for judgment by relieving the plaintiff from the payment of costs, this order being consented to in writing by the attorneys for the respective parties.

On July 26th the plaintiff served a notice of appeal, which was acknowledged "without prejudice to the claim that the same was out of time." The defendant thereupon moved in the Appellate Division of the Superior Court to dismiss the appeal. That court granted his motion, holding that by the phrase "subject to law" in Article VI, Section II, paragraph 3 of the Constitution of 1947, which directs that "The Supreme Court shall make rules governing the administration of all courts in the State and, subject to law, the practice and procedure in all such courts," "The Legislature is given the final word in matters or procedure; it may expressly or by implication nullify or modify a procedural rule promulgated by the Supreme Court or it may take the initiative in a matter of procedure when it deems that course wise." 5 *N. J. Super.* 30, 34 (*App. Div.* 1949). In the absence of legislative action the Appellate Division held that *Rule* 1:2–5(b) and *Rule* 4:2–5, limiting the time for an appeal from a final judgment of the trial division of the Superior Court to 45 days, prevailed over *R. S.* 2:27–356, which permitted an appeal within one year after judgment rendered. Thus we have raised the meaning of the phrase "subject to law," and it is urged on us that the question should be promptly decided in view of the recent passage of Chapter 171 of the Laws of 1950, authorizing an Advisory Committee on the Revision of Statutes to prepare a revision of Title 2, Administration of Civil and Criminal Justice, and Title 3, Administration of Estates, of the Revised Statutes, and related acts.

The phrase "subject to law" is not only ambiguous. but elliptical. No word in the law has more varied meanings

than the term "law" itself. Nor is the phrase "subject to" crystal clear, for the phrase implies a limitation rather than a grant of power. It is argued by the plaintiff that "subject to law" means subject to statute law or legislation. If this is what the Constitutional Convention intended, it would have been easy for it to say so. We must take the phrase as we find it and endeavor to ascertain its meaning in the light of the entire Constitution and of the intent of the people in adopting it. There can be no doubt in the mind of anyone familiar with the work of the Constitutional Convention or with the ensuing election at which the Constitution was adopted by the people that, along with the desire to strengthen the powers of the Governor and to amplify the powers of the Legislature, there was a clear intent to establish a simple but fully integrated system of courts and to give to the judiciary the power and thus to impose on them the responsibility for seeing that the judicial system functioned effectively in the public interest. Indeed, in the minds of many, if not a majority, of our citizens this was the primary reason for their desire for a new constitution.

If "subject to law" were to be interpreted to mean subject to legislation, it would necessarily follow that once the Legislature had passed a statute in conflict with a rule of court, the rule-making power of the Supreme Court would be *functus officio,* for it would be intolerable to hold, as has been suggested to us, that after the Legislature has passed an act modifying a rule of court, the Supreme Court might in turn adopt a new rule overriding the statute, and so on *ad nauseam.* Such an unseemly and possibly continuous conflict between these two departments of the State Government could never have been contemplated by the people. And yet if "subject to law" means subject to legislation, any other construction of the rule-making power would be in conflict with the fundamental rule of constitutional construction that unless the context clearly requires otherwise, a constitutional grant of authority is to be interpreted as a continuing power. As one studies the Judicial Article of the Constitution and its care-

fully designed provisions for an efficient judicial organization with unusual powers of effective administration, it is evident that the people of this State thought of the rule-making power in the Supreme Court as a continuous process. In this connection it is significant to note that neither the Constitution of 1776 nor that of 1844 contained any provisions whatsoever as to rule-making, admission to the practice of law, the discipline of the bar, an administrative head of the courts, or the assignment of judges. All of these powers are necessarily of a continuing nature if the judges are to be held responsible for the functioning of the courts. It is inconceivable that the people granted continuing power to the courts in all these respects but withheld it with reference to rule-making, which is quite as essential to the operation of an integrated judicial establishment as are any of the other powers.

Article VI, Section II, paragraph 3 of the new Constitution not only gives the Supreme Court the rule-making power, but it imposes on the Supreme Court an active responsibility for making such rules—"The Supreme Court *shall* make rules." If there were any doubt as to the continuous nature of the rule-making power, such doubt would be resolved by this imposition of the positive obligation on the Supreme Court to make rules for all the courts.

An analysis of all of the pertinent provisions of the Constitution serves to convince us that the phrase "subject to law" cannot be taken to mean subject to legislation. In the first place, by Article XI, Section IV, paragraph 5 of the Constitution "The Supreme Court shall make rules governing the administration and practice and procedure of the County Courts" this provision is clear and unambiguous; the rule-making power of the Supreme Court with respect to the county courts is absolute and unrestricted. It does not require an active imagination to anticipate the chaotic situation which would prevail in every court house in the State with the Supreme Court promulgating the rules for the county courts and the Legislature dictating the practice and procedure of the Superior Court. One of the objectives of the people in

adopting the Constitution was to provide for uniformity as well as simplification and flexibility in the work of the courts. This objective would be frustrated by any such dual exercise of rule-making power. Manifestly no such construction of the phrase "subject to law" should be accepted because of the unfortunate results which would inevitably flow therefrom unless no other rational meaning can be found for the phrase. Nor can it be said that the grant to the Supreme Court of the rule-making power with respect to the county courts was a constitutional accident. Article XI, Section IV, paragraph 5 of the Constitution was reported to the Convention by the Judiciary Committee as part of its report of the Judicial Article (*I Convention Proceedings Record* 146), and though it ultimately found its way into Article XI (Schedule) it was passed by the Convention on the same day as the Judicial Article and in the original form in which it was presented to the Constitutional Convention by the Judiciary Committee (*I Convention Proceedings Record* 793).

In the second place the power of the Supreme Court with respect to the practice on proceedings in lieu of prerogative writs is likewise unrestricted; by Article VI, Section V, paragraph 4 of the Constitution "Prerogative writs are superseded and, in lieu thereof, review, hearing and relief shall be afforded in the Superior Court, on terms and in the manner provided by rules of the Supreme Court. * * *" But there are still other provisions in the Judicial Article which would give the Legislature power with respect to the courts if "subject to law" means subject to legislation that clearly are inconsistent with the intention of creating an integrated judicial system. Thus by Article VI, Section III, paragraph 1, the judges of the Superior Court are empowered to "exercise the powers of the court subject to rules of the Supreme Court." Could it conceivably have been intended by the people that the Legislature might, through the rule-making power, affect the power of the judges of the Superior Court? Again, by paragraph 3 of the same section it is provided that each division of the Superior Court "shall have such Parts, consist of such num-

ber of Judges, and hear such causes, as may be provided by rules of the Supreme Court." Is it consistent with all of the other provisions of the Judicial Article of the Constitution, designed to create an integrated judicial establishment, that the Legislature should be construed to have the power to determine the number of parts of each division of the Superior Court, the number of judges in each part, and the causes that each division or part should hear? By paragraph 4 of the same section it is laid down:

"Subject to rules of the Supreme Court, the Law Division and the Chancery Division shall each exercise the powers and functions of the other division when the ends of justice so require, and legal and èquitable relief shall be granted in any cause so that all matters in controversy between the parties may be completely determined."

If the Legislature may amend the rules of court, it may decide the extent to which the Law Division and the Chancery Division shall exercise the powers and functions of the other division, and it may control the degree to which legal and equitable relief may be granted in any cause. We think it may be safely said that no such thoughts were ever in the mind of any member of the Constitutional Convention or of any citizen who voted for the Constitution. And yet if "subject to law" means subject to legislation, such results might inevitably follow. The courts in some of their essential judicial operations, instead of being one of the three coordinate branches of the State Government, would have been rendered subservient to the Legislature in a fashion never contemplated by any.

What, then, is the meaning of "subject to law"? The only interpretation of "subject to law" that will not defeat the objective of the people to establish an integrated judicial system and which will at the same time give rational significance to the phrase is to construe it as the equivalent of substantive law as distinguished from pleading and practice. The distinction between substantive law, which defines our rights and duties, and the law of pleading and practice, through which

such rights and duties are enforced in the courts, is a fundamental one that is part of the daily thinking of judges and lawyers. Substantive law includes much more than legislation, it comprehends also the rights and duties which have come down to us through the common law. The phrase "subject to law" in Article VI, Section II, paragraph 3 of the Constitution thus serves as a continuous reminder that the rule-making power as to practice and procedure must not invade the field of the substantive law as such. While the courts necessarily make new substantive law through the decision of specific cases coming before them, they are not to make substantive law wholesale through the exercise of the rule-making power.

The only contrary authority that has been cited to us is the statements contained in the Report of the Judiciary Committee of the Constitutional Convention. Thus, it said at pages 7 and 8 of its report:

"The third shortcoming of the existing judicial organization, and perhaps the most costly, is the total lack of business-like organization, coordination and supervision of the courts as a whole. A corollary feature of this condition is the practice of resigning responsibility for the formulation of practice and procedure to intermittent revision by the Legislature. * * * This Court was given the power to make rules for administration, practice and procedure in all courts, subject to the overriding power of the Legislature with respect to practice and procedure."

But this report of the Judiciary Committee, though dated August 26, 1947, was not handed to the members of the Convention until August 28th, *I Convention Proceedings Record* 809, two days after the Judicial Article had been adopted by the Convention on August 26th, *I Convention Proceedings Record* 793. The report of the Judiciary Committee therefore cannot be deemed a part of the parliamentary history of the Constitution, for it was not known to and was not acted upon by the members of the Constitutional Convention in voting in favor of Article VI, creating a new judicial system. The report, moreover, while signed by all of the mem-

bers of the Committee, concludes by saying, "Although the foregoing is the report of the Judiciary Committee, it is not necessarily to be inferred that the comments therein contained express the views of all members." Thus not only was the report of the Judiciary Committee from which we have quoted not before the Convention at the time that it acted on Article VI, but a search of the entire proceedings fails to disclose any debate on the meaning of the phrase "subject to law." The chief debate on the Judicial Article was between the merits of the proposal submitted by the Judiciary Committee and another proposal submitted from the floor.

The phrase "subject to law" seems to have originated in the draft of a constitution submitted by the Constitution Revision Commission of 1942. There we find in Article V, Section II, paragraph 3, the following provision:

"The Supreme Court shall make rules as to the administration of all the courts, and, subject to law, as to pleading, practice and evidence in all the courts." (*Report p.* 46.)

But the report of the Commission made it abundantly clear that "subject to law" as used by it did not refer to legislation:

"The supreme court is given *complete* power (and responsibility) with respect to making rules as to administration, pleading, practice and evidence in all of the courts of the State." (*Report p.* 24.)

Complete power and responsibility in the judiciary are concepts quite inconsistent with the notions of overriding legislation. A comparative study of the 1942 draft and of the 1947 Constitution will reveal the extent to which many of the provisions of the 1942 draft were accepted as the foundation of the work of the 1947 Constitutional Convention. The widespread use of the 1942 draft by the members of the Constitutional Convention is a matter of common knowledge. There was a peculiar reason for including "subject to law" in the 1942 draft. That draft, unlike our present Constitution, gave the Supreme Court rule-making power as to evidence. If its

power to make rules as to evidence had not been made subject to law in the sense of substantive law, it would have had the authority to alter the substantive law especially by making changes in the law of presumptions; hence the necessity for the limitation "subject to law."

In the proposed Constitution of 1944 the rule-making power was prescribed by Article V, Section II, paragraph 3, as follows:

"The Supreme Court shall make rules governing the administration of all the courts in this State. It shall have power, also, to make rules as to pleading, practice and evidence, which may be applicable to all of the courts in the State, and which shall have the force of law unless changed or abrogated by law."

This proposal was entirely different from the draft of 1942 and the Constitution of 1947. It gave the Supreme Court power over rules of administration, but provided a clear legislative veto of rules of pleading, practice and evidence. If it had been the intention in 1947 likewise to circumscribe the rule-making power of the Supreme Court, the language of the 1944 proposal, which was defeated at the polls by the people, could have been repeated. Instead the language of the 1942 draft was utilized and it carried with it the interpretation placed upon it by the Constitution Revision Commission of 1942 as giving the Supreme Court complete power and responsibility, a concept quite inconsistent with the idea of overriding legislation. Notwithstanding the rejection of the language of the proposed 1944 Constitution which would have emasculated the rule-making power of the Supreme Court, in 1948 the Legislature passed S-58, section two of which provided in part that the Rules promulgated by the Supreme Court, effective September 15, 1948, "shall regulate practice and procedure in the courts established by the Constitution until modified, altered or abrogated by law." The bill was vetoed by the Governor who returned it to the Legislature on October 30, 1948, stating that in his opinion this provision was unconstitutional, "for it would, if effective, completely

deprive the Supreme Court of any further rule-making authority * * *," 71 *N. J. L. J.* 389 (November 4, 1948). While the constitutionality of legislation is ultimately a question for judicial determination, the opinion of the Governor on such questions is to be given consideration by us.

Whatever confusion there may be as to the nature of the rule-making power stems from an oversimplification of the doctrine of the separation of powers. Too many people think of the Legislature as a body that has as its sole function the making of laws for the future, the Governor as a chief executive who merely enforces the law, and the courts as having power only to decide cases and controversies. While these notions are true so far as they go, they are quite insufficient to explain the complicated operations of the three great branches of government, either historically or analytically. Thus, while the primary function of the courts is to decide cases and controversies properly brought before them, the Legislature also has the power to adjudicate as to the qualifications of its members, their deportment while in office, as well as in impeachment proceedings on the misdemeanors of all state officers, and the Governor has the right to try any officer or employee in the Executive Department on charges after notice and an opportunity to be heard, and a host of controversies are decided in administrative tribunals which are not courts but which are located in the Executive Branch of the government. Thus, adjudication is not exclusively a judicial function, *Mulhearn v. Federal Shipbuilding and Dry Dock Company,* 2 *N. J.* 356, 364 (1949). Similarly. both the Legislature and the courts exercise what seems to be the executive function of enforcing the law when they punish recalcitrants for contempt, as does the Supreme Court likewise when it disciplines members of the bar. The courts, moreover. often perform non-judicial functions as legislative agents which otherwise would find their place in the Executive Branch of the State Government, *Massett Building Co. v. Bennett,* 4 *N. J.* 53, 56 (1950). These powers of enforcing the law, while they may seem at first blush to be executive in

nature, are essential to the maintenance of the integrity of the legislative and judicial branches of the government. In like manner the Governor when he issues proclamations and exercises his ordinance power generally, the administrative agencies when they exercise rule-making power may seem to be exercising legislative power, but such powers, at least in the case of the Governor and the courts, are inherent and essential to the performance of the primary functions for which their offices are created in the Constitution. Not only are these seeming exceptions to an oversimplified statement of the doctrine of separation of powers necessary as a matter of logic and analysis of governmental activities, but they have centuries of historical justification. Not only here but elsewhere throughout the common-law world they are recognized, originally solely by force of tradition and common law but now in most instances as a result of express constitutional limitations.

Rules of court for controlling practice and procedure date back to the Middle Ages. They were the settled means of effecting changes and improvements in procedure, which had its origin in custom. That rules of court did not continue to be the exclusive means of developing practice and procedure in the courts is due to the gradual growth in England of the doctrine of parliamentary supremacy culminating in the overthrowing of the Stuarts and the "Glorious Revolution of 1689," and in the United States to the legislative hegemony in both the Federal Government and the states down to the Civil War, abetted by the ultraconservatism of the courts and the legal profession in refusing to simplify the ultraformal, cumbrous, dilatory and expensive procedure inherited from the Middle Ages. These factors made possible, indeed, necessitated a century ago the adoption in New York and elsewhere of the Field Code of Civil Procedure. The Field Code, like every other procedural code, however, was subject to the inherent weakness that it was susceptible to perennial and multitudinous amendments. many of them passed to overcome the supposed defects of the Code in individual cases. The Code,

too, had the defect of all legislation in being rigid and inflexible as compared with the elasticity and adaptability of rules of court. In many states, therefore, the codes have in the course of a century become far worse than the medieval maze which they superseded. But it must not be thought from this brief recital of the course of procedural history in this country that the courts generally abdicated their power to make rules governing practice and procedure. Thus, in 1792 we find Chief Justice Jay stating that the Supreme Court of the United States "considers the practice of the courts in King's Bench and Chancery in England as affording outlines for the practice of this Court and that they will, from time to time, make such alterations therein, as circumstances render necessary." *Case of Hayburn, 2 Dallas* 411, 1 *L. Ed.* 437. Rules of procedure were promulgated by the Supreme Court of New York in 1799, and the exercise of judicial power of rule-making continued there until the adoption of the Code of Civil Procedure where they are enforced today. New Jersey never adopted a code of civil procedure but instead short practice acts, and the exercise of the rule-making power here has been continuous, covering practice and procedure on a broad scale, so much so that our judges and lawyers would refer to the rules a hundred times to every time they looked at the Practice Act or the Chancery Act. The federal courts have led the way in the development of modern rule-making; first, in 1842 with equity and admiralty rules, then, in 1898 with bankruptcy procedure, and in 1938 with rules of civil procedure, and in 1946 with rules of criminal procedure. The trend throughout the country has been to give the courts the power to regulate their own procedure and administration and then to hold them responsible for results. The reasons for this trend are obvious. Rules of court are made by experts who are familiar with the specific problems to be solved and the various ways of solving them. In this State under the new Constitution the Supreme Court took the course of designating the outstanding authorities on procedural law in the bar of the State to prepare a tentative draft of proposed rules

of court, at the same time calling on the bar for suggestions. The tentative draft was distributed to the judges and lawyers of the State, who submitted hundreds of suggestions, all of which were examined by the experts appointed by the Court, and then appraised by the Court itself before the Rules of Court were finally promulgated by the Court on September 15, 1948. The rule-making process here has become a continuous one, the Court calling each spring for suggestions from the bench and bar and especially from committees appointed by the state and county bar associations. Their suggestions are considered every year, preliminary to action by the Supreme Court, at the annual Judicial Conference made up of the judges, the legislative leaders, the Attorney General and the county prosecutors, the officers and trustees of the State Bar Association, the president of each of the county bar associations, and 60 delegates from the county bar associations, one representative from each law school in the State on the approved list of the American Bar Association, the Administrative Director of the Courts, and ten laymen appointed by the Chief Justice. Thus, in a very real sense may it be said that our Rules of Court are the product of the joint efforts of the bench and bar of the State, with the Supreme Court necessarily making the ultimate decision as to the contents of the rules. Rules of court, moreover, have the great advantage that not only are they made by experts, but they are interpreted and applied by judges who are sympathetic with them. Changes may be made whenever occasion may require without waiting for stated legislative sessions and without burdening already overworked legislators. Finally, procedure may be made subsidiary, as it should be, to the substantial rights of the litigants. The courts may avoid the snarls of procedural red tape and concentrate on the substantive questions at issue. These views summarized here are expressed at length in articles written by two of the greatest legal scholars of the first half of the twentieth century, one by Dean Roscoe Pound on "The Rule-making Power of the Courts" in 12 *A. B. A. J.* 599 (1926), and the other by Dean John H. Wigmore on

"All Legislative Rules For Judiciary Procedure Are Void Constitutionally" in 23 *Ill. L. J.* 276 (1928). Our Constitution is one of the first to incorporate the rule-making power expressly along with principles of efficient judicial management. Very wisely, too, the Constitution reposed the rule-making power for all of the courts in one court, for in this State before the new Constitution each court exercised the rule-making power for itself, and the rules collectively were often conflicting and always unnecessarily complicated, results which are to be sedulously avoided in the interests of uniformity, simplicity and adaptability. Even with this power vested in the Supreme Court the tendency to deviation is difficult to restrain; see *Kozoroski v. Monta,* 3 *N. J. Super.* 242, 244 (*App. Div.* 1949), and *In re Pfizer,* 8 *N. J. Super.* 6, 10 (*App. Div.* 1950), where powers are claimed for the Appellate Division that are not available to any other court including the Supreme Court.

We therefore conclude that the rule-making power of the Supreme Court is not subject to overriding legislation, but that it is confined to practice, procedure and administration as such. In the present case *Rules* 1:2–5 and 4:2–5 apply, *Weslervelt v. Regency,* 3 *N. J.* 472 (1950). The appeal here was not taken within 45 days of the original order for judgment of May 25, 1948. The question remains as to whether or not the order of June 11, 1949, entered on the court's own motion, relieving the plaintiff from costs extends the time for filing an appeal for 45 days thereafter. This order was consented to by the attorneys for each party and it is therefore not appealable. *Pemberton's Case,* 40 *N. J. Eq.* 520, 530 (*Prerog.* 1885). It is also an order made for the plaintiff's benefit, and therefore the change was clearly immaterial as to him, *Newark v. Fischer,* 3 *N. J.* 488, 492 (1950).

The judgment appealed from is affirmed but without costs.

CASE, J. (concurring). I concur in the finding that the initial authority to make rules lay with the court, that the appeal from the judgment of May 25, 1949, was not taken

within the time fixed by rule; that the modification effected by the order of June 11, 1949, was not only to the plaintiff's benefit but was consented to by him, and was not appealable; that the appeal was therefore properly dismissed; and that the judgment below should be affirmed. That, without more, disposes of the litigation.

However, the court has taken this opportunity to consider at length the constitutional authority of the court to make rules, and as I do not agree in an important respect with the majority opinion I am constrained to state my views and my reasons. The questions are—Do the words "subject to law," as used in Article VI, Section II, paragraph 3 of the 1947 Constitution mean anything? And if they mean something, what do they mean?

This is the provision: "The Supreme Court shall make rules governing the administration of all courts in the State and, subject to law, the practice and procedure in all such courts." That sentence will repay study. Note that two kinds of rules are mentioned, and that the words "subject to law" are carefully placed to bear upon rules concerning practice and procedure and not to bear upon rules governing the administration of the courts. That, having in mind the history of rule-making, is what one would expect, because the courts of law have traditionally made rules for their own government and just as traditionally have acknowledged, except in the one respect which I shall presently mention, the superior authority of the Legislature in ordaining the practice and procedure in our courts. And that dissipates much of what has been said would be confusion if the words "subject to law" are construed to mean "subject to statutory law." The number of parts of each division of the Superior Court, the number of judges in each part, the causes that each part shall hear—these are all matters of court administration and therefore are within the express constitutional provision that the Supreme Court shall make rules governing the administration of all courts—note that, *all* courts—in the State without being "subject to law." I further suggest that Article

VI, Section III, paragraphs 3 and 4 are a constitutional direction that the Superior Court shall be divided into an Appellate Division, a Law Division and a Chancery Division and that the Law Division and the Chancery Division shall each exercise the powers and functions of the other when the ends of justice so require and that legal and equitable relief shall be granted in any cause so that matters in controversy between the parties may be completely determined; and that the reference in each of those paragraphs to the rules of the Supreme Court has nothing to do with the changes in the court system thus established but only to the administration of the courts in the execution of those functions. Thus did the framers of the Constitution anticipate the present controversy and wisely distinguish the two divisions in the rules, one for the administration of the courts within the unfettered control of the Supreme Court, and the other for pleading and practice subject to law.

The words "subject to law," or their equivalent, were too persistent in their presence through the several constitutional drafts, and their change of relative position has too much pertinency, to permit of the suggestion that they were without definite design.

In 1942, a Joint Legislative Committee, constituted under legislative authority, proposed what is known as the 1942 draft. That was the parent of the series of drafts which culminated in the accomplished fact and is illuminative of the Constitution as finally adopted.

Article V, Section II, paragraph 3 of the 1942 draft provided:—"The Supreme Court shall make rules as to the administration of all the courts, and, subject to law, as to pleading, practice and evidence in all the courts." That, except as to evidence, is in effect a counterpart of the provision under discussion. When the 1942 draft, molded into what may be termed the 1944 draft, was submitted to the people for vote the provision was as follows:—"The Supreme Court shall make rules governing the administration of all of the courts in this State. It shall have power, also, to make rules as to

pleading, practice and evidence, which may be applicable to all of the courts of this State and which shall have the force of law unless changed or abrogated by law." Here, too, the power of the court to make rules for the administration of itself and of the other courts was absolute, while the power to make rules as to pleading and practice—as well as evidence—was conditional. This distinction is important, because, in the first place, it followed the traditional conception and so conformed to expectation, and second, it used words which demonstrated, without room for serious dispute, that the "law" which was referred to was general statutory law— what else would so fully and so satisfactorily meet the condition, "unless changed or abrogated by law?"

In the summer of 1947 the Constitutional Convention assembled in New Brunswick and in approaching its work subdivided into committees, of which one of the most important, holding in its membership some of the ablest legal minds in the State, was the Committee on the Judicial Article. That committee, in its tentative draft of the Judicial Article, widely circulated among our people, proposed this version of the rule-making power:—"The Supreme Court shall, subject to law, make rules governing the administration and the practice and procedure in all the courts of the State." It will at once be observed that this draft did what none of the earlier ones had attempted—it directed that not only the court's power to make rules as to practice and procedure should be "subject to law" but also that the power to make rules governing the administration of the courts should be so subject; and I suggest that, by fair interpretation, the words "subject to law," as here used, are synonymous with the phrase "which shall have the force of law unless changed or abrogated by law" and were substituted as shorter, smoother and in better grammatical form; such a substitution as one would make in editing his own composition.

In the final form—the one adopted by the Convention and submitted to and accepted by the people, the words "subject to law" were carefully preserved, but they were transferred

so that they did not apply to the power of the court for self-administration but did apply to the control of practice and procedure. Beyond peradventure the Constitution means that the court in making rules has a certain field in which it shall not be "subject to law," and that it has another field in which it acts "subject to law."

Can it be said with any show of reason that the phrase "subject to law" just happened, or that it came into existence and was changed and re-established, without a very definite notion as to what the words meant? I think not.

Well, then, what do they mean?

The Attorney General makes two suggestions. The first is that "law" as here used means the fundamental or organic law—the Constitution. But his own excellent judgment causes him to veer from this view because he concedes, as necessarily he must concede, that all rules—he might add, every power of the court, not only, but of the executive and the Legislature—is subject to the Constitutions Of State and Nation. And the Constitution does not do the silly thing of limiting its various and multiple delegations of authority by adding here and there, "subject to law." Therefore, the second suggestion, that perhaps the phrase "subject to law" means subject to "substantive" law; that the court may promulgate a rule of practice which causes an apparent or real conflict with a statute enacting substantive law and that in such an event the rule of court would fall because it conflicts with a substantive statute. But he comes back to the theme that the Supreme Court is supreme in its sphere of practice and procedure because the Constitution so provides; and this I suggest begs the question. I believe it is not now seriously considered that the word "law" means constitutional law; and once it is conceded that it means "statutory law" in any of its phases the bars are down, because if it means statutory law in any sense it means statutory law in all senses. The Constitution makes no limitation either expressly or by implication.

There can be no doubt about what the majority of the committee on the Judicial Article meant in proposing the paragraph. These are the words of their report on paragraph 3 of Section II signed by all of them, including men of such eminence in the legal world as a former Chief Justice of the Supreme Court and a present member of our Appellate Division:—

"Responsibility for administration, practice and procedure in all the courts of the State is vested in the Supreme Court, but the Legislature may revise or repeal the rules of practice and procedure, or initiate new provisions on the subject. * * *."

In words as plain as could be used the committee stated that "subject to law" meant "subject to statutory law."

The very next paragraph of the Constitution, Article VI, Section III, paragraph 1, provides that "The Superior Court shall consist of such number of judges as may be authorized by law, but not less than twenty four * * *." That undoubtedly means statutory law. So as to the next section, Article VI, Section IV, paragraph 1:—"There shall be a county court in each county which shall have all the jurisdiction * * * and such other jurisdiction consistent with this Constitution as may be conferred by law." Likewise as to paragraph 2, next following:—"There shall be a judge of each county court and such additional judges as shall be provided by law * * *." So, too, in Section I of Article VI, twelve or fifteen lines above the paragraph on rules, is this provision:—"The inferior courts and their jurisdiction may from time to time be established, altered or abolished by law." And the word, with the same significance, is used in many other instances throughout the document. It is quite out of character that a group of legal experts, intent upon drawing the most notable document of their lives, would use the same word in a whole series of related paragraphs and intend in one of those instances, in the midst of all the others, to give a very special and limited meaning without adding some adjectival distinction.

The one exception, which I mentioned, to the recognition by the former Supreme Court of the superior authority of the Legislature to regulate practice and procedure was in the matter of the prerogative writs, and the exception there was a modified one. The court vigorously maintained its exclusive jurisdiction over those writs, without diminution or alteration by the Legislature, *East Orange v. Hussey*, 70 *N. J. L.* 244 (*E. & A.* 1903), and yet even there the power of the Legislature to regulate remedies and to enact statutes of repose by which a reasonable time was prescribed within which suits must be instituted was freely conceded. *Traphagen v. Township of West Hoboken*, 39 *N. J. L.* 232 (*Sup. Ct.* 1877); affirmed, 40 *N. J. L.* 193 (*E. & A.* 1878). The determination of what was a reasonable time was reserved by the court to itself, but the court uniformly approved of the statutory period in the cases brought before it. *Red Oaks, Inc., v. Dorez, Inc.*, 117 *N. J. L.* 280 (*Sup. Ct.* 1936); *Owen v. Atlantic City*, 125 *N. J. L.* 145 (*Sup. Ct.* 1940); *Peckitt v. Board of Adjustment of Spring Lake*, 136 *N. J. L.* 405 (*Sup. Ct.* 1947). I find nothing in Article VI, Section V, paragraph 4 of the 1947 Constitution which is out of line with this *status* of the former prerogative writs or with the view I have earlier expressed. The last cited constitutional provision is that prerogative writs are superseded and, in lieu thereof, review, hearing and relief shall be afforded in the Superior Court, on terms and in the manner provided by rules of the Supreme Court. It is not to be expected that the framers of the Constitution. having in Article VI, Section II, paragraph 3, given absolute power to the court as to rules relating to administration and limited power over pleading and practice, should feel constrained to repeat those provisions each time they made subsequent reference to the subject of rules.

There is nothing novel in the proposition expressed by the report of the Committee on the Judicial Article that responsibility for making rules should be initially vested in the Supreme Court, and that the Legislature might revise or repeal the rules of practice and procedure or initiate new pro-

visions on the subject. That was the course followed from the inception of our statehood. At the February term, 1805, the Supreme Court in promulgating a new set of rules said in part:—

"Whereas many of the rules, heretofore established in this court for regulating the practice thereof, have, either in whole or in part, been superseded by the act of the legislature made on that subject, entitled 'An act to regulate the practice of the courts of law' * * * Therefore the justices of said court, having carefully inspected and considered the same, Do ORDER: that all the said rules heretofore made and established, be from henceforth vacated and holden for none * * *." 1 N. J. L. page v.

I have said that the authority of the court, generally recognized, has been to make rules concerning practice and procedure, subject to legislative enactment. And that is not only so of this State, but practically of all jurisdictions. The widely praised "Federal Rules of Civil Procedure," used as a working basis for the framing of our own rules, were promulgated by the United States Supreme Court, not by inherent authority or by constitutional enactment, but pursuant to an Act of Congress, 48 Stat. 1064, 28 U. S. C., §§ 723b, 723c (1934), now 28 U. S. C. A., § 2072. What Congress gives it may take away; it will not, of course, take away so salutary a power, but the point is that the authority is legislative, and that the power to change is there. In touching upon the federal situation it may have some pertinency on the association of the term "law" with "legislative enactment" to quote the words of Chief Justice Marshall in Osborn v. The Bank of the United States, 9 Wheaton 738, 866, 6 L. Ed. 204, 234 (1824) (italics inserted), "Judicial power is never exercised for the purpose of giving effect to the will of the judge; always for the purpose of giving effect to the will of the legislature: or, in other words, to the will of the law."

So it is that from the very beginning the authority of the court, recognized by the court and everyone, has been to make rules concerning practice and procedure, subject to being superseded by legislative enactment; and now, the constitutional mandate being that the court shall have the power to

make such rules, subject to law, and the committee of skilled and learned members who placed that article before the Convention having certified to the Convention that the language meant just what we have been saying, by what process of reasoning can the Constitution be interpreted as meaning anything else? Even if it be that for some reason the formal report of the committee was not distributed among the general membership of the Convention until after the Judicial Article had been adopted, it is hardly to be assumed that if the provision in question was given any discussion whatever on the floor of the Convention the committee members who so frankly expressed their views over their signatures in the report would have omitted to mention them in the debate, or, lacking any floor discussion, that the general delegates to the Convention would attribute to the word a meaning out of the normal use throughout the article and the entire document. Moreover, after the final committee report had been printed and placed on the desk of each delegate, and the general features thereof had been called to the attention of the Convention by the acting chairman of the Committee speaking from the floor (*I Convention Proceedings Record, p.* 809), five supplemental recommendations affecting the Judicial Article (*Id.* 824) were separately considered and approved and ten days later, on the coming in of the report of the Committee on Arrangement and Form, the very sentence which is the subject of this opinion was debated on the question of making a substitution of words in the interest of clarification and to avoid ambiguity, and the suggested change was made (*Id.* 868, 869); but the proposal and the action had nothing to do with the words "subject to law" and the clarity of that expression was not questioned, although the entire Convention had known for ten days of the Committee's interpretation that the Legislature might revise or repeal the rules of practice and procedure, or initiate new rules on the subject.

The whole drift of thought and events leads directly to the conclusion that the word "law" in the phrase "subject to law" includes statutory law within its application and, if our effort

is to find the actual meaning which the words, as written, were intended to convey, that there is nothing to justify the limitation implicit in the word "substantive."

It is certain that the people of the State wanted extensive changes in their fundamental law and that, through their representatives, they framed, and by their direct vote they adopted, a Constitution to that end. But search has not yet uncovered any evidence that their wish for a change went beyond the provisions written down in that instrument. I suggest that a purpose to divest the Legislature of a field of enactment which, since the founding of our nation, here and everywhere, had been within the legislative province, should have been clearly expressed, and that if, as I think is incontrovertible, it was not clearly expressed, then it must be deemed to have had no existence. The time of the Convention, and of the events just before and just after, is not so far removed that men and women may not with effect search their memories for what then transpired; and I believe that memory will be as void as are the records as to any general understanding that the Legislature was to be stripped of its ultimate control over pleading and practice.

Constitutions are not made, and ought not to be construed, upon the hypothesis that men presently or prospectively in office will continue indefinitely to function in their particular capacities. They are built upon fundamental, continuing facts of human relations and theories of government. Individuals come and go, but constitutions run on. The several branches of government, absolutely and relatively, vary from decade to decade and generation to generation in the degree of virility and wisdom with which they serve their periods. We have weak courts and strong courts, weak legislatures and strong legislatures, weak governors and strong governors; but it would be disastrous to build or develop a constitution upon the assumption that the characteristics manifested at a given time in one or another of these governmental parts will continue without variation. Judges are men, with very much the same virtues and faults as other men; and, taking men by

and large, particularly men in public office, it has rarely been found wise, in the long run, to vest them with power upon which there is no check. Our American conception of constitutional government is one of checks and balances. If the governor exceeds his limitations, if the legislature goes beyond its powers, the courts are available to enforce the constitutional restraints. But if our Supreme Court exceeds its powers, who shall impose the check? Therein lies the danger when the court undertakes, not to construe law, but to *make* it.

Let us take for convenient illustration the court rules upon which the present case turns. Until our 1947 Constitution went into effect and the new court rules were promulgated, the statutory period of appeal (*R. S.* 2:27–356) in civil cases of this nature was one year from the time judgment was entered. Under the new rules (1:2–5) that period was reduced to forty-five days, and it was made unlawful (1:7–9) for the court to extend that time. If the appeal is not taken within forty-five days, the ax falls. The rules were adopted under the constitutional provision that the Supreme Court should make rules concerning practice and procedure. But the Constitution also provided (*Article VI, Section V, paragraph* 2) that there should be an appeal from the Law Division to the Appellate Division, and the question was raised in the Appellate Division whether forty-five days was enough to constitute a reasonable period for the appeal which the Constitution granted. The Appellate Division held that in ordinary cases, of which this was one, the time was ample, but it surmised conditions which, should they exist, would make the time unreasonably short; and that was one way of saying that the rule under certain conditions would, in the opinion of that court, be unconstitutional. Indeed, the opinion said in terms that a limitation, whether adopted by the Supreme Court or by the Legislature, is not within their constitutional power if it fixes a time so short as to impair substantially the right of appeal; and that, theoretically, is so. But the Appellate Division did not promulgate the rule, nor was it the court of last resort. If one of those surmised

conditions should be present here—the question does not arise now because I think we all agree that forty-five days in this case was, in fact, ample—the issue would be presented in the court which made the rule and which considered at the making that the time was ample. It has already passed once on the question. Of the maximum number of seven justices who would sit, four would make, or would be sufficient to make, the decision; three if by an eventuality, which sometimes happens, only five of the seven justices should sit. And all of the controlling votes might well be of justices who were under life tenure. Because I am of an age where life tenure has no significance to me personally I make free to express my unqualified approval of that improvement in the court system, but I feel obliged to say also by just that degree is the possibility of a check lessened. Added to the rather cloistered detachment which a justice feels obligated to preserve, it does not make for warm contacts with the everday working problems of the litigant and the practitioner. We have the valuable experience, briefly each year, of meeting with the Judicial Conference, of having their suggestions and of hearing their comments; but that is an advisory committee, without power of determination. The justices make the decision; four of them; perhaps three of them; on their own handiwork, a rule that cuts deeply into property and property rights. That decision would be absolutely honest and highly intelligent; but that is not the whole story; it could also be doctrinaire and arbitrary.

The application of much of what I have been saying is to the wisdom of the court in stretching words beyond their reasonable sense in order to hold a subject matter within the court's unresponsible creation and control. A constitutional mandate to take what has always been a legislative function and place it both initially and finally in the hands of the court ought, as I have said, to be very clear; particularly since it is the court which makes the decision in its own favor.

The desire, I take it, is to save the body of rules which, with care and labor, has been built up during the past two

and a half years from being scuttled; and that is a laudable desire. I think, however, that the system, as such, is in no danger. It is scarcely conceivable that any devastating attack could successfully make its way through both houses of the Legislature and the Governor's approval; it is still less conceivable, that such an attack, renewed over the Governor's veto, public approval of the system being as we believe it is, could secure a two-thirds vote in each house. The chance of success for such a movement is negligible. That is a practical estimate which I think is sound. But if there be a chance, is it not such a chance as those who live in a democracy must be prepared to take? Or, putting it another way, for this is what it amounts to, may we weight down the scales of justice because of distrust of our democratic processes? In my opinion, carefully reached, there is greater danger to our democratic form of government in following the lure of expediency than in marking our course by the compass.

The trend is toward leaving matters of pleading and practice to the courts; true; but leaving them there by legislative act or acquiescence. And I think that the intent of the Constitution is that way; giving the Supreme Court the authority, indeed the direction, to set up a body of rules in the first instance, and leaving to the Legislature the authority, if it deems necessary, to intervene; with the belief that the necessity will not arise and that the Legislature will exercise its authority with that restraint which is fitting in all relations between the several departments of the government.

I believe that most students of the law, following the usual rules of construction and interpretation, and not being swerved by the impulse to find a way of reaching a desired result, will find little to criticize in the learned and human opinion written herein by Judge Bigelow for the Appellate Division in which it is said:—

"In our opinion, it was the intention of the people of the State thereby to vest in the new Supreme Court a power to regulate procedure that would be unhampered and unrestricted by the common law or by statutes enacted prior to the adoption of the Constitution.

The expression 'subject to law' referred to statutes that might thereafter be enacted by the legislature pursuant to the general grant of legislative power contained in Article IV of the new Constitution. The legislature is given the final word in matters of procedure; it may expressly or by implication nullify or modify a procedural rule promulgated by the Supreme Court, or it may take the initiative in a matter of procedure when it deems that course wise."

Case, J., concurring in result.

*For affirmance*—Chief Justice VANDERBILT, and Justices CASE, OLIPHANT, WACHENFELD, BURLING and ACKERSON—6.

*For reversal*—Justice HEHER—1.