19 N.J. Super. 274 (1952)
88 A.2d 246
THE STATE OF NEW JERSEY, BY THEODORE D. PARSONS, ATTORNEY-GENERAL OF THE STATE OF NEW JERSEY, PLAINTIFF,
v.
UNITED STATES STEEL CORPORATION, A CORPORATION OF THE STATE OF NEW JERSEY, DEFENDANT.
Superior Court of New Jersey, Chancery Division.
Decided March 31, 1952.
*277 Mr. Theodore D. Parsons, Attorney-General of the State of New Jersey (Mr. Emerson Richards, attorney specially appointed by the Attorney-General for prosecution of the above cause, appearing), attorney for the State.
Messrs. Stryker, Tams & Horner (Mr. Josiah Stryker appearing, Mr. Valdemar Beeken, of counsel), attorney for the defendant.
GOLDMANN, J.S.C.
Plaintiff instituted this escheat action on November 3, 1948 pursuant to the provisions of L. 1946, c. 155, N.J.S.A. 2:53-15 et seq. The complaint is in the usual form; it alleges that defendant has in its custody or possession certain personal property subject to escheat and demands judgment escheating it. Defendant answered, alleging that certain dividends on its capital stock have been unclaimed, or the owners of the dividends or the whereabouts of such owners have been unknown, for more than the statutory period of 14 years. Defendant further states that as to certain shares of stock, the owners or their whereabouts have been unknown for 14 years or more, and the dividends on such shares unclaimed for that period.
The answer sets up a number of defenses, some of them so far-reaching that, if sustained, they would completely defeat the escheat. At the time the answer was filed, a companion escheat action against the Standard Oil Company was in the course of determination. Further proceedings herein were deferred pending completion of that case. State v. Standard Oil Company, 5 N.J. 281 (1950), 341 U.S. 428, 71 S.Ct. 822 (1951) has disposed of the more fundamental of the defenses raised in the present answer.
On June 28, 1951, and after final determination of the Standard Oil case, an order was entered in this action fixing September 7, 1951, as the time and the State House Annex, Trenton, as the place for final hearing. The order directed that notice of the time and place of the final hearing be given by plaintiff in accordance with the provisions of R.S. 2:53-21. *278 Such notice was duly published. On September 7, 1951, the hearing was continued in order to afford the parties an opportunity to enter into an agreement as to facts not in dispute. The stipulation filed September 24, 1951, embodies the essential facts in the case.

I.
United States Steel Corporation was organized in 1901 under the laws of the State of New Jersey, and has its registered office in Hoboken. As of November 3, 1934, the cut-off date in this action (being 14 years before the filing of the complaint), there were issued and outstanding 3,602,811 shares of preferred stock of $100 par value, and 8,703,252 shares of common stock of $100 par value. In 1938 the common stock was changed to stock without par value, but with a stated value of $75 a share, and in 1948 the stated value was changed to $100 a share. In 1949 the common stock was split, three shares for one. The corporation maintained and maintains records listing the names and addresses of its stockholders.
From time to time, by appropriate action of the defendant's board of directors, dividends were declared and made payable upon preferred and common stock, a separate resolution being adopted as to each class of stock. These resolutions were always in substantially the same form. An extract from the minutes of the board of directors of October 30, 1928, was attached to the stipulation of facts as an exhibit. These minutes, and the corporation's procedure in carrying out the resolutions of the meeting, are typical and illustrative of all dividends declared between 1901 and 1935. The extract shows that the following successive steps were taken:
1. The chairman called attention to the report of the finance committee and the statement of the comptroller showing that the corporation had surplus or net profits sufficient for the payment of dividends on the preferred stock and also on the common stock.
2. On the basis of the comptroller's statement, the board of directors adopted a resolution declaring a dividend on the preferred stock, and *279 fixing a date for the payment thereof, which date was about a month after the date of declaration of the dividend. This resolution also provided that a sum equal to the amount of the declared dividend "be set aside from the surplus or net profits of the Corporation as a special fund for the payment of such Dividend No. ___ on the Preferred stock." (This was in accordance with a charter provision that when all preferred dividends, cumulative and accrued, had been declared and become payable, and the company had either paid such dividends or set aside from its surplus or net profits a sum sufficient for the payment thereof, "the Board of Directors may declare dividends on the common stock, payable then or thereafter, out of any remaining surplus or net profits.")
3. A brief intermission would follow the adoption of the resolution, during which defendant's check in the amount of the preferred stock dividend, drawn to the order of J.P. Morgan & Company, was delivered to it, together with a letter of transmittal in which J.P. Morgan & Company was requested to set aside the amount "as a special fund" for the payment of the particular preferred dividend just declared. Immediately upon receipt of the check and letter, J.P. Morgan & Company sent defendant a letter acknowledging receipt of the check and stating that it had credited the same to defendant's special account for payment of the preferred stock dividend.
4. After the intermission, the chairman stated to the board that the treasurer had reported that the amount of the preferred dividend "has been actually set aside from the surplus or net profits of the Corporation as a special fund for the payment of [such dividend] on the Preferred stock." Thereupon, the board of directors adopted a resolution declaring a dividend on the common stock and fixing a date for the payment thereof, that date being about two months after the date of declaration of the dividend.
Whenever a preferred dividend was declared, the corporation charged the amount of the dividend to its Surplus Account and credited an account entitled "Dividends on Preferred Stock  Unpaid." On the day preceding the date fixed for payment of the preferred dividend (about one month after the declaration), J.P. Morgan & Company, with whom the funds had been set apart to pay the dividend, transferred such funds, pursuant to a check drawn by the defendant, to a specific dividend account in another bank, that account being in the name of J.P. Morgan & Company. Dividend checks payable to the order of holders of preferred stock were drawn on this account, such checks being checks of the defendant prepared and signed by its officers. At this *280 time the defendant charged the amount of the dividend to the account "Dividends on Preferred Stock  Unpaid," and credited "Cash."
Whenever a common stock dividend was declared, defendant charged the amount of the dividend to its Surplus Account, and credited an account entitled "Dividends on Common Stock  Unpaid." On the day preceding the date fixed for payment of the common dividend (about two months after the declaration), defendant paid over to J.P. Morgan & Company, from its general cash, an amount equal to the common dividend to be disbursed. This amount was recorded in an account in J.P. Morgan & Company, in the name of J.P. Morgan & Company. Contemporaneously with this, J.P. Morgan & Company deposited in its name an equivalent amount in another bank, in a dividend disbursing account against which checks were to be drawn. Dividend checks payable to the order of holders of common stock were drawn on this account, such checks being checks of the defendant prepared and signed by its officers. At this time the defendant charged the amount of the dividend to the account "Dividends on Common Stock  Unpaid," and credited "Cash."
The practice as to common dividends just described was followed until 1932, when defendant stopped depositing any sum with J.P. Morgan & Company to pay the common dividends. Thereafter defendant deposited the amount of the declared common dividend in a dividend disbursing account standing in its own name in the bank against which the dividend checks were to be drawn. The bookkeeping entries were the same as before.
It is stipulated that a separate dividend disbursing account was used to pay each dividend declared on each class of stock.
It was defendant's practice when a person became a stockholder to ask him to sign a printed form known as a "Permanent Dividend Order." Four exhibits attached to the stipulation of facts show the various forms of permanent dividend orders in use between 1901 and 1949. Prior to 1941, no *281 dividend check would be mailed unless such an order had been executed and filed by the record owner of stock with the defendant company.
At the top of each of the three forms used in the period from 1901 to 1931, there appears a request to the stockholders "to fill in and sign the attached permanent order, and upon receipt of the same from you we will file it as your instructions covering the mailing of future dividends on your holding of Shares in the Capital Stock of the Corporation." The order covered all future dividends and was to remain in force until further instructions were received.
The "Permanent Dividend Order" that is part of each of these three forms is addressed to the defendant's treasurer, and requests him to "pay, by checque on New York, to the order of ____ by mail to the following post office address: ____ all dividends due, and which may hereafter be due," on all shares of the capital stock, preferred and common, that may at any time stand in the stockholder's name on the books of the defendant corporation, until the order was revoked in writing.
The fourth of the permanent order forms, used from 1931 to 1949, differs from the other three in the text appearing at the top of the page, ahead of the request to the treasurer. The text reads:
"Your name and address is recorded on our ledgers as it appears on the envelope in which you received this form.

IF CORRECT PLEASE RETAIN THIS FORM FOR FUTURE USE
Should you desire your dividend checks drawn in a different manner or mailed to another address kindly fill in the attached dividend order, sign it personally, and mail to United States Steel Corporation, Stock Transfer Department, 71 Broadway, New York 6, N.Y."
From the very beginning certain of the dividend checks mailed pursuant to such dividend orders were never presented for payment, nor were they returned by the postoffice. Other checks so mailed were returned by the postoffice because the person named in the order could not be located at the address given therein. In such event defendant withheld the mailing *282 of further checks until the stockholder or his designee could be located. Defendant kept separate lists of the checks returned by the postoffice, and of those not returned but never presented for payment.[1]
Schedule A attached to defendant's answer contains a list of checks payable prior to November 3, 1934, but unpaid November 18, 1948, which were returned by the postoffice or which, though not returned, were never presented for payment. Except as certain of these items were to be excluded under authority of an order of the court dated September 13, 1951, the schedule comprehends all dividends which were unpaid and unclaimed for more than 14 years prior to the filing of the complaint, and the persons entitled to such dividends, or their whereabouts, were unknown during such period. Such unpaid dividends on preferred stock totalled $157,372.04, and on common stock $185,418.78, or a grand total of $342,790.82.[2]
*283 Schedule A also contains a list of persons shown on defendant's records as the present record owners of the shares of stock set opposite their names, such persons having been shown as such record owners for more than 14 years prior to the filing of the complaint. These individuals had not received or presented for payment dividend checks on their respective shares of stock for more than 14 years prior to the filing of the complaint, nor had they received dividends thereon down to November 18, 1948.[3]
The published notice of the time and place of hearing stated not only the name and record address of each of these stockholders, and the number of shares held by each, but also set forth the certificate number under which the shares were issued, and the dividends thereon unpaid less than 14 years prior to the cut-off date, November 18, 1948.

II
The conditions prescribed by the Escheat Act, N.J.S.A. 2:53-15 et seq., exist in this case. The personal property which is the subject of the action and which is set forth in Schedule A of defendant's answer (less certain items which the parties have stipulated shall be excluded), has been unclaimed for 14 successive years, and the owners or the whereabouts of the owners of such property have been unknown for that period of time. Plaintiff claims that such *284 personal property has, therefore, under the provisions of the statute escheated to the State. Defendant recognizes that the conditions of the statute apparently exist, but puts forward a number of defenses denying the State's right to escheat. These defenses represent the residue of those originally set up in the answer, and are considered by the defendant as not having been decided by the Standard Oil case. They will be considered in the order in which they were argued.

III
The first defense is that no trust was created with respect to the dividends declared by defendant on its common stock. In effect, defendant contends that under the facts the relationship between the corporation and its common stockholders, upon the declaration of any dividend, was that of debtor and creditor. More than six years having elapsed from the time the dividends were declared and made payable, before the escheat statute was enacted and this action instituted, defendant claims a vested right to the plea of the statute of limitations which the Legislature cannot take away.
Defendant insists that the situation relating to dividends declared by it on its common stock differs from that involving its preferred stock dividends. It admits that a trust fund was created for preferred dividends, but argues that reference to the procedure followed by the board of directors in declaring dividends on the common stock shows there was no intention to create a trust fund as to such dividends. Defendant explains that the deposit of common dividends prior to the date for payment thereof was not for the purpose of creating a trust fund, but merely for the convenience of payment of the dividends.
Re-examination of the procedure followed by the board of directors in declaring dividends and, subsequently, by the defendant upon the declaration of such dividends, shows that there was no essential difference between what the *285 defendant did as to preferred dividends and what it did as to common dividends. The preferred and common stock dividend resolutions, as has already been pointed out, followed immediately upon the report of defendant's finance committee and the statement of its comptroller showing that the corporation had surplus or net profits to an amount in excess of the sum required for the payment of the proposed preferred and common dividends. The language of these resolutions was almost identical, except that in the case of the preferred stock there was an additional paragraph providing that a specific sum be set aside from surplus or net profits as a special fund for the payment of the dividend. Defendant's argument that there was no trust fund created in the case of common dividends apparently hinges upon the absence of such an additional paragraph in the common stock dividend resolution, and therefore the resolution created no more than a debtor-creditor relationship.
The reason for the additional paragraph in the preferred dividend resolution is apparent and has already been adverted to. The board of directors was merely being careful to comply with the corporate charter provision that
"Whenever all cumulative dividends on the preferred stock for all previous years shall have been declared and shall have become payable, and the accrued quarterly installments for the current year shall have been declared, and the company shall have paid such cumulative dividends for previous years and such accrued quarterly installments, or shall have set aside from its surplus or net profits a sum sufficient for the payment thereof, the Board of Directors may declare dividends on the common stock, payable then or thereafter, out of any remaining surplus or net profits."
This provision, of course, looked to the protection of preferred dividends, cumulative and accrued, and their payment in advance of common dividends. With what may be described as a meticulous regard for the quoted charter requirements, the board of directors, immediately upon adoption of the resolution which declared the preferred dividend and set aside an amount sufficient for its payment, actually took a *286 recess in order to allow a messenger to take defendant's check to the nearby office of J.P. Morgan & Company. The whole procedure was extraordinarily careful  the letter of transmittal to the Morgan Company, its immediate reply thereto acknowledging receipt of the dividend fund, and all the rest. Having made sure that the preferred dividend fund had been "set aside," the directors then proceeded to declare the dividend on the common stock.
The charter provision gives the complete explanation for the variation made in the case of the preferred dividend declaration. In every other respect, the board of directors had no reason to differentiate between preferred and common dividends; in fact, it made no differentiation between them in its procedures.
The textual difference in the two dividend resolutions aside, the sequence of events following the declaration of the common stock dividend shows quite clearly that there was a setting up of a special fund in the case of the common dividends as fully as in the case of the preferred dividends. In both instances it will be seen that the following was done:
(1) At the time the dividend was declared, defendant charged the amount thereof to its Surplus Account and respectively credited the accounts "Dividends on Preferred Stock  Unpaid" and "Dividends on Common Stock  Unpaid."
(2) After the dividend was declared, defendant drew its check to the order of J.P. Morgan & Company for the amount of the dividend. This was done immediately after the declaration of the preferred dividend; in the case of the common dividend it was done the day before the date fixed for payment of that dividend.
(3) On the day preceding the date fixed for the payment of each dividend, J.P. Morgan & Company transferred the funds it had received to a specific dividend account in another bank, such account standing in the name of J.P. Morgan & Company.
(4) Preferred and common dividend checks were drawn against the respective accounts of J.P. Morgan & Company in such other bank or banks.
(5) Defendant's book entries were alike in each instance, the "Dividends on Preferred Stock  Unpaid" and "Dividends on Common Stock  Unpaid" accounts being respectively charged with the amount of the checks drawn for the preferred and common dividends, the "Cash" account being credited in either instance.
*287 The only difference, then, between what was done in the case of preferred dividends and what was done in the case of common dividends is that in the former situation the necessary funds were set aside immediately upon the declaration of the dividend, while in the latter the necessary funds were set aside at a later date. In both cases, however, the funds were set aside before the date fixed for payment of the respective dividends.
Defendant admits there was a trust fund as to the preferred dividends. There was equally a trust fund created for payment of the common dividends. It may be noted that there was no language in the case of either the preferred dividend resolution or the common dividend resolution which specifically declared a trust or an intention to create a trust. It is what was done that is determinative. What the defendant intended to do in the case of the preferred dividend it did in the case of the common dividend. When it says that it intended to create a trust in the case of the former, it must of necessity say, under the facts, that it intended to create a trust in the case of the latter. There is no suggestion that what was done in the case of the common dividends was done by defendant's officers and agents with less authority than in the case of the preferred dividends. There is no escape from the clear parallel existing between what was done in both cases, or from the logic dictated by the circumstances.
Nonetheless, defendant contends that whatever may be the determination as to the appropriation and setting apart of funds for common dividends before 1932, there was no such appropriation or setting apart after that date.
The stipulation of facts notes that after 1932 the defendant no longer deposited funds with J.P. Morgan & Company to pay the common dividends, but deposited the necessary amount in a dividend disbursing account in its own name in the bank against which the checks were to be drawn, a separate disbursing account being used to pay each common dividend as declared. Defendant's book entries after 1932 were, however, the same with respect to common dividends as they *288 were before that time, and the entries before 1932 were, as noted above, exactly alike as to both preferred and common dividends.
The court finds there is no essential difference between defendant's action in providing a special fund for common dividend payments by depositing such fund with J.P. Morgan & Company, who would then deposit it in a separate dividend account in another bank, and its action in depositing the necessary amount in a separate dividend disbursing account in its own name in the bank against which the dividend checks were to be drawn.
Defendant would distinguish this case from the Standard Oil Company case. A comparison of the two cases fails to provide a basis for such distinction. Defendant's procedure as to common dividends declared before 1932 is comparable to what the Standard Oil Company did after 1918 (5 N.J. 281, at pages 299-300). In 1918, Standard Oil Company appointed Guaranty Trust Company of New York as its transfer agent; thereafter, declared dividends were paid by the check of the Trust Company drawn upon funds deposited by Standard Oil for that purpose. These deposits were mingled with the general funds of the Trust Company in the same manner as any general commercial deposit would be. In the case at hand, defendant paid J.P. Morgan & Company an amount necessary to meet the declared common dividend. This amount was recorded in an account in J.P. Morgan & Company in the name of that company, and contemporaneously therewith, J.P. Morgan & Company deposited a like amount in a bank against which the dividend checks were to be drawn, such account also being in the name of J.P. Morgan & Company. There was no less a setting apart of a fund here than in the Standard Oil case. One notes that the book entries made by Standard Oil Company and by the defendant were similar.
The procedure which the defendant followed after 1932 is similar to what the Standard Oil Company did before 1918 (5 N.J. 281, at page 299). Before 1918 that company *289 deposited the amount of the dividend in National City Bank of New York, in a dividend disbursing account in the name of the company. Defendant here, after 1932, deposited the amount of the common dividend in a bank in a dividend disbursing account in its name. As in the Standard Oil case, so here  dividend checks were drawn by the corporation against the dividend disbursing account to the order of the stockholders, and mailed to the stockholders at the addresses shown on the records of the company. The book entries of Standard Oil Company were the same before 1918 as after, just as defendant's book entries were the same before 1932 as after.
The Standard Oil case held that the limitations of R.S. 2:24-1 (now N.J.S. 2A:14-1) were not operative to extinguish the stockholders' rights to the dividends there in question, and that the dividends escheated to the State. Justice Heher, speaking for a court which was unanimous on this point, said (at page 302):
"The trust fund theory is a more realistic concept of the substance of the transaction here and the relationship between the parties than that of a mere debt within the operation of the statute of limitations. There was a segregation from the company's funds of the moneys to be devoted to the payment of the dividends. The mere declaration of a dividend by a corporation gives rise to a debt as against it in favor of the individual stockholders; but where `the fund for its payment has been actually set apart and distinguished from the general mass of the company's funds, the fund so set apart becomes a trust fund for the payment of the dividend, which cannot be reached by the general creditors of the corporation, and when it becomes a trust fund for the payment of dividends it cannot be diverted and used for any other purpose. * * * There seems to be a fundamental distinction between a fund set apart for the payment of a dividend and a fund set apart for the payment of an ordinary indebtedness.' Re Interborough Consolidated Corporation, 288 Fed. 334, 32 A.L.R. 932 (1923); certiorari denied, Porges v. Sheffield, 262 U.S. 752, 43 S.Ct. 700, 67 L.Ed. 1215 (1923)."
Justice Heher (at page 303) then cites cases holding the rule to be that "segregation of funds to meet a declared dividend constitutes the corporation a trustee for the stockholders," and declares that principle "is rooted in our jurisprudence," *290 quoting from Breslin v. Fries-Breslin Co., 70 N.J.L. 274, 287 (E. & A. 1904).

IV
The second defense relates to both preferred and common stock dividends. Defendant contends that all dividends for which it mailed checks pursuant to dividend orders "were paid by the mailing of such checks and thereafter such stockholders had claims on the checks and not for dividends."
The resolutions respectively declaring dividends on the preferred and common stock provided that such dividends were "payable at the office of the Corporation," located in New York City. Defendant's complete reliance is upon the dividend orders already described and which it was its practice to secure from stockholders. Dividend checks were mailed pursuant to the information contained in these orders, in envelopes bearing defendant's name and return address on the outside and with proper postage affixed. Before 1941, the company would not mail a dividend check to a stockholder unless there was an executed dividend order on file in its office.
The form of the several dividend orders used by defendant from 1901 to 1949 has already been described, and the quotations therefrom give the essential content. They were a means whereby defendant kept its stockholders mailing lists up-to-date. This is substantiated by the last of the four forms of dividend orders attached to the stipulation of facts as exhibits and used between 1931 and 1949, stating that the stockholder's name and address were recorded on defendant's ledgers as they appeared on the envelope in which the form was enclosed. This form then goes on to say: "If correct please retain the form for future use."
In support of its argument, defendant calls attention to the language of the form appearing directly below the request that the stockholder fill in and sign the attached order which, upon receipt, would be filed "as your instructions *291 covering the mailing of future dividends." Defendant notes that the language which follows reads: "Please pay, by check on New York, to the order of ____ by mailing to the following post office address: ____ all dividends due, and which may hereafter be due," on shares held by the stockholder. It insists that by reason of this language the dividend order constituted an agreement between the stockholder and defendant, so that when defendant mailed its check to the person designated in the order at the address set forth therein, the dividend was paid and the stockholder thereafter had a claim on the check which paid the dividend, but no claim on the dividend as such.
If defendant is right in its contention, then State v. Standard Oil Company, 5 N.J. 281 (1950), 341 U.S. 428, 71 S.Ct. 822 (1951) comes into play. A claim on a check would be barred by the statute of limitations after the expiration of six years; the Escheat Act would not operate on a claim so barred by the statute at the time the State's right, if any, accrued. Escheat would be frustrated because, under defendant's theory, the stockholders had merely claims on checks which were barred long before the enactment of the Escheat Act.
[2, 3] In order that a check shall constitute payment of an obligation, there must be an agreement between the parties that such shall be its effect. In the old case of Freeholders of Middlesex v. Thomas & Martin, 20 N.J. Eq. 39 (Ch. 1869) it was said (at page 41) that:
"a check or promissory note, either of the debtor or a third person, received for a debt, is not payment if not itself paid, except in cases where it is positively agreed to be received as payment."
This principle was followed by our highest court in Weisberger v. J.G. Corporation, 107 N.J. Eq. 61 (E. & A. 1930), a foreclosure action based upon default in payment of interest under the terms of the mortgage, the defense being payment by check mailed within the time when payment was due. Complainant denied ever having received the check, and *292 defendant alleged the envelope was never returned to him. It was admitted that the check had never been presented for payment. The vice-chancellor dismissed the bill on the ground that the mailing of the check constituted payment. The Court of Errors and Appeals reversed, holding there was no proof of an agreement that interest instalments should be paid by check and forwarded by mail. The court said (at pages 62-63):
"The mailing of a check by a debtor for the amount of his indebtedness to the payee is not, in the absence of an expressed or implied agreement to that effect, a payment or discharge of the debt; * * *."
The most recent expression of the principle is found in Condenser Service, etc., Co., Inc., v. Mycalex Corporation of America, 7 N.J. Super. 427 (Law Div. 1950), where Judge Brennan said (at pages 429-430):
"As to the first defense, the check itself was not payment because it was not itself paid and the rule is that a check does not constitute payment unless itself paid except in cases where it is positively agreed to be received as payment." (Italics ours.)
To the same effect, see 70 C.J.S., Payment, § 24(a), page 233, and cases there cited, as well as § 24(b), page 237 where it is noted that some authorities require that the agreement to receive a check in payment be "express, positive [as in the Condenser Service case], specific or special." There is nothing in the dividend orders under consideration which can be construed as a positive agreement, or for that matter any agreement, that the check would be received as payment.
Defendant relies upon the English case of Thairwall v. The Great Northern Railway Company (1910), 2 K.B. 509. The company directors had voted a dividend which was to be paid by the mailing of warrants. The stockholders had notice as to how the directors proposed to pay the dividend, and by resolution approved the directors' proposal. The court held that the dividend was paid by the mailing of the warrants, and that the stockholders had no further remedy except upon the warrants themselves. There is in the present case no *293 action by the stockholders as a body which may be considered the equivalent of the action taken in the Thairwall case. Nor is there anything in the record to show that the defendant, through its board of directors, ever took any action, formal or informal, providing that dividend checks were to be sent to stockholders of record through the mails. The only action taken by the board is reflected in its dividend resolutions, all of which call for payment of the dividends at the New York office of the corporation.
Other cases cited by defendant in support of its position, among them Norman v. Ricketts, 3 Times L.R. 182; Tayloe v. Merchants Fire Insurance Co., 9 How. 390 (U.S. Sup. Ct. 1850); Sutton v. Baldwin, 146 Ind. 361, 45 N.E. 518 (Sup. Ct. 1896), Harbison v. Frazier, 64 S.W. 738 (Ky. Ct. Apps. 1901), and Baughman v. Lowe, 41 Ind. App. 1, 83 N.E. 255 (App. Ct. 1908), relate to situations where there was a positive agreement that payment might be made by check, or where the check was actually accepted as payment by the payee. In Diskin v. City of Philadelphia Police Pension Fund Ass'n., 168 Pa. Super. 76, 76 A.2d 663 (1950), a pension was held to have been paid by defendant's mailing of a check, in view of the fact that the association's by-laws specifically provided that pension payments were to be made by check drawn to the order of the pensioner. The case is not applicable to the present situation.
If defendant's thesis were accepted, it would lead to a contradictory situation as to the three classes of checks involved in this action: (1) those mailed and not cashed; (2) those mailed and returned, and (3) those that were not mailed but held because prior checks had been returned undelivered. If the checks in the first group constituted payment, so that stockholders had claims only on the checks and not for dividends, then what of the second and third groups of checks? They are in defendant's own hands, and any claim that defendant had discharged its obligation to the stockholders involved could hardly be pressed as to these checks.
*294 When the several dividend funds were deposited in separate disbursing accounts they were, as has already been concluded, trust funds. Where no check was drawn to pay a particular stockholder his dividend, the statute of limitations would not apply. Defendant now tries to predicate a valuable right, the plea of the statute of limitations, upon the dividend orders in this case. If defendant contemplated having such a right, it could have expressed in clear language the fact that the mailing of any dividend check would be considered payment. Had it done so, stockholders would at least have had notice that such mailing could work to their prejudice.

IV
Defendant's next contention is that if the amendment of 1951 to section 7 of the Escheat Act is valid, the notice in this case is invalid for failure to comply with such amendment. Initially the attack was much broader; defendant questioned whether the original Escheat Act, L. 1946, c. 155, was not actually invalid under the doctrine of Winberry v. Salisbury, 5 N.J. 240 (1950). The suggestion made was that in view of that case all procedures theretofore established by the Legislature were invalid unless ratified by rules of the Supreme Court. Examination of the Winberry case indicates that it is more limited in its effect.
Winberry v. Salisbury stands for the proposition that where a rule of procedure promulgated by the Supreme Court and a statute are in conflict, the rule prevails over the legislative enactment. Neither that case nor any case that has since considered the rule-making power has held that a procedural provision in a law, not in conflict with a Supreme Court rule, was ipso facto abolished because of the constitutional provision, Const. 1947, Art. VI, sec. II, par. 3, conferring the rule-making power upon the Supreme Court. Such a procedural provision stands until the Supreme Court has exercised its power. Cf. Const. 1947, Art. XI, sec. I, par. 3, which provides that "All law, statutory and otherwise, *295 * * * in force at the time this Constitution or any Article thereof takes effect shall remain in full force until they expire or are superseded, altered or repealed by this Constitution or otherwise." (Italics ours).
To hold otherwise would be to invalidate not only the Escheat Act, but other acts, of which the Workmen's Compensation Act is an example, wherein the Legislature has set forth the procedure to be followed for effectuating the purposes of the law. It cannot be said to have been the intent of those who framed the new Constitution, or of the people in adopting it, to leave suspended the enforcement of such laws important to the public welfare, until the Supreme Court promulgated specific rules for their enforcement. No such intention can be drawn from the decision in the Winberry case which addressed itself to answering the critical problem posed by an existing conflict between a rule of court and a statutory procedure.
The Supreme Court, consistent with the constitutional provisions cited, has provided for situations where the rules do not specifically prescribe a procedure to be followed. In such case Rule 3:105 provides that "the court shall proceed in any lawful manner not inconsistent with the Constitution, these rules or any applicable statutes."
The very fact that the opinion in the Winberry case was handed down on the same day State v. Standard Oil Company, 5 N.J. 281 (1950) was decided provides the perfect answer to defendant's original doubts. In the Standard Oil case the court held constitutional the procedure followed under the Escheat Act, with one exception  the provision dispensing with publication where the value of the personal property of any one owner was less than $50. Had the court considered the procedural provisions of the Escheat Act as vitiated by its decision in the Winberry case, it would most certainly have said so.
In its final argument defendant resolved its original doubt about the validity of the Escheat Act, stating that: "While some doubt may exist, it is our opinion that procedural *296 statutes in force at the time the Constitution became effective and which are not inconsistent with subsequent rules adopted by the Supreme Court remain valid." It does, however, continue to question the validity of the 1951 amendment to section 7 of the Escheat Act, L. 1951, c. 304, sec. 4; N.J.S.A. 2:53-21. What was said about the effect of Winberry v. Salisbury on the original Escheat Act, need not be repeated here. The Supreme Court has not yet adopted rules relating to the practice and procedure to be followed in escheat cases.
The 1951 amendment called for a procedure different from the one previously prescribed for the notice to be given of the filing of the complaint and the time and place fixed for hearing. Before the 1951 amendment the act required, among other things, that the notice be published once a week for three successive weeks and state that any person claiming an interest in the property must file his written claim with the court at least five days prior to the date fixed for hearing. The amendment required that the notice be published once a week for two successive weeks and also be posted in a place in the State Capitol specified by the court. Under the amendment a claimant was required to file his written claim at least three days prior to the hearing. The only aspect of the 1951 amendment which defendant considers material is the difference in the time within which claims had to be presented.
The escheat notice in this action was published in the Trenton Times on August 3, 10 and 17, 1951. The thousands of stockholders' names and addresses, with the unclaimed dividends and shares respectively due them, all set in 6-point type, filled almost 16 1/2 pages of the newspaper. The cost of publication was $18,150.30. The notice required claimants to file their written claims five days prior to September 7, 1951, the date fixed for hearing, as prescribed by the old act. Defendant's contention is that the new act having become effective before any notice was published, it clearly controlled, and the notice should have called for the *297 filing of claims within three days of the date fixed for hearing.
L. 1951, c. 304, was the end product of a bill which the Governor returned to the Legislature on June 26, 1951, with his "conditional veto," for reconsideration and amendment as recommended. The bill was reenacted by the Senate under emergency resolution on July 2, and by the Assembly on July 9. It was approved by the Governor on July 13, and by its terms became effective forthwith. The order fixing time and place of final hearing and for publication of notice had in the meantime been signed on June 28, 1951.
It is recognized as a general principle that where a new statute deals with procedure only, it prima facie applies to all actions  to those which have accrued or are pending, and to future actions. 50 Am. Jur., Statutes, § 482, p. 505; 59 C.J., Statutes, § 701, p. 1175. Commenting on this rule, 2 Sutherland on Statutory Construction (3d ed. 1943), § 2212, p. 136, states:
"But the steps already taken, the pleadings, and all things done under the old law will stand, unless an intent to the contrary is plainly manifest. Pending cases are only affected by general words as to future proceedings from the point reached when the new law became operative."
Justice Cardozo had occasion to discuss the retroactive effect on pending litigation of statutes relating to remedies and procedure in Berkovitz v. Arbib & Houlberg, Inc., 230 N.Y. 261, 130 N.E. 288 (Ct. Apps. 1921). He observed, 230 N.Y. at page 270, 130 N.E. at page 290:
"Changes in the form of remedies are applicable to proceedings thereafter instituted for the redress of wrongs already done. They are retrospective if viewed in relation to the wrongs. They are prospective if viewed in relation to the means of reparation. * * * A different problem arises when proceedings are already pending. There is then a distinction to be noted. The change is applicable even then if directed to the litigation in future steps and stages. * * * It is inapplicable unless in exceptional conditions, where the effect is to reach backward, and nullify by relation the things already done. * * * There can be no presumption, for illustration, *298 that a statute regulating the form of pleadings or decisions is intended to invalidate pleadings already served, or decisions already filed * * *."
Publication of the notice here was simply the carrying out of the directions contained in the order entered on June 28, 1951, a date when there was as yet no amendment to section 7 of the Escheat Act. The order was plaintiff's directive to proceed in accordance with its terms, and this the plaintiff did. The published notice was valid in the circumstances.
An illustration of what could happen if defendant's contention were sound is this: Suppose the order had been signed June 8, 1951, fixing August 10, 1951 as the time for final hearing. Suppose, further, plaintiff proceeded under the order and published the notice on June 30, July 7 and July 14. Could it then be maintained that the notice, calling for the filing of claims at least five days before final hearing, was defective because the last publication appeared one day after the 1951 amendment became effective? Nothing gives support to the belief that the Legislature intended so harsh a consequence, rendering futile the expenditure of time, effort and money involved. Cf. Berkovitz v. Arbib & Houlberg, Inc., above, 230 N.Y. at page 272, 130 N.E. at page 290.
Defendant did not question the possible invalidity of the notice until September 7, 1951, the date of final hearing (adjourned to a later date), when the matter was informally mentioned. On that day the principal subject discussed by defendant's counsel was its application for an order which, in effect, completely eliminated any further consideration of the five-day limitation contained in the order for publication. The requested order was consented to by plaintiff and signed September 13, 1951.
This order modified one entered upon the filing of the complaint on November 3, 1948 and which required defendant, among other things, "to retain in its custody or possession such escheatable personal property as it now has in its *299 custody or possession until further order of this court." The preamble recites that defendant had prior to November 10, 1948 ascertained the identity and whereabouts of certain persons entitled to unpaid claims and had paid the amounts due; that thereafter it had ascertained the identity and whereabouts of other persons with claims to dividends or shares of stock; and that in response to the published notice still others had come forward and furnished proof tending to substantiate their claims. The preamble further recites that defendant might from time to time before judgment entered ascertain the identity and whereabouts of other persons referred to in its answer, or their successors in interest, and that yet others might respond to the published notice and assert their claims.
The order of modification permitted defendant to pay any of the claims set out in its answer, or to deliver or otherwise deal with any share or certificate of stock, where defendant was satisfied that it had located the person originally entitled thereto or his successor in interest. Similar authority was given as to any such persons defendant might thereafter locate or who might otherwise come to its attention. All payments or transfers were to be made within 60 days from the date of the order, and defendant was to file with the court a certified statement of such payments or transfers within ten days thereafter. The following provision in the order is of interest:
"That it shall not be necessary to the validity of any such payment or transfer that the person to whom the payment or transfer is made shall have appeared or filed a claim in writing with the court in accordance with R.S. 2:53-22."
Thus, defendant sought and obtained an order which made possible dividend payments and stock transfers to persons who had not filed their claims within time. The order was, of course, both equitable and practical. Not only had many persons presented their claims after the last day allowed by the notice, but many more came forward after the September 13 order was signed. As the 60-day period neared its end and *300 still other claimants continued to appear, defendant again applied for and obtained a second order, dated November 13, 1951, extending the operation and effect of the first order through December 1, 1951. It required defendant to file its verified statement of all payments and transfers made under the two orders by December 7, 1951. Such statement was filed and has been referred to in previous footnotes which show that claimants received $159,319.71 of the $342,790.82 in dividends listed as unclaimed, 52 of the original 90 shares of unclaimed common stock, and four of the original 17 shares of unclaimed preferred stock. Two things are evident: (1) the published notice was unusually effective, and (2) its five-day provision, now under attack, proved no bar whatsoever to defendant's satisfying a host of out-of-time claimants, and this by the simple device of asking for and readily receiving plaintiff's consent and the court's approval of the arrangement.
The 1951 amendment of the Escheat Act, L. 1951, c. 304, and the notice published pursuant to the order of June 26, 1951, are held valid.

V
The schedules annexed to the answer list 17 shares of preferred and 90 shares of common stock, whose owners or their whereabouts have been unknown to defendant for 14 successive years. Defendant concedes that under the decision in the Standard Oil case, the State is entitled to escheat these shares. Dividends have regularly been declared on such escheatable shares down to the present time. Defendant claims that the State is not entitled to escheat any of the dividends which became payable less than 14 years prior to the institution of this action.
The State contends that such dividends are subject to escheat, basing its claim upon N.J.S.A. 2:53-15, now N.J.S. 2A:37-11, which defines "personal property" to mean and include
*301 "moneys, negotiable instruments, choses in action, interest, debts or demands due to the escheated estate, stocks, bonds, deposits, machinery, farm crops, live stock, fixtures, and every other kind of tangible or intangible property and the accretions thereon, up until the time of the filing of the bill of escheat, but shall not mean and include real property or property in the custody of any court in this State, nor any personal property covered by chapter one hundred ninety-nine of the laws of one thousand nine hundred and forty-five." (Italics ours)
Plaintiff argues that these dividends are "accretions" to the shares of stock in question and that the Legislature must have intended that the income from or increments of escheated property during the period intervening before the institution of the action should likewise escheat. To hold otherwise would leave the dividends declared on the escheatable shares during the 14 years next preceding the filing of the complaint in a suspended state, thus requiring successive annual escheat proceedings.
The first ground advanced by defendant in support of its view is that the shares of stock in question may have been transferred from the record owner to others during the 14-year period in question, or the record owner may have died prior or subsequent to the expiration of that period and persons entitled to his estate may have succeeded to such ownership. The argument is met by the rule that proof of ownership at a given time raises the presumption of continuing ownership. The language of 31 C.J.S., Evidence, § 124, p. 736, that "Proof of the existence at a particular time of a fact of a continuous nature gives rise to an inference, within logical limits, that it exists at a subsequent time," was quoted with approval by the Court of Errors and Appeals in Rein v. Travelers Insurance Company, 124 N.J.L. 554, 557 (1940). And see Wallraff v. W.J.B. Motor Truck Co., 98 N.J.L. 67, 69 (Sup. Ct. 1922); Orcutt v. Hoyt, 6 N.J. 46, 55, 56 (1950). The rule has been applied in property and financial matters (31 C.J.S. 743):
"Except where there is evidence to the contrary, where it is shown that certain property belongs to a particular person, the law presumes that the ownership remains unchanged * * *."
*302 The presumption is, of course, rebuttable, but defendant has not submitted any evidence to rebut it.
The more fundamental question raised by defendant is the meaning of "and the accretions thereon" found in N.J.S.A. 2:53-15. The definitions found in legal reference works are not helpful, for they relate almost entirely to accretions in the sense of increases to land by the addition of portions of soil. "Accretion," as related to corporate finance, has received very limited consideration in the reported cases. One is thrown back upon such standard non-legal works as Webster's New International Dictionary (2d ed.), which defines "accretion" as "a. organic growth; enlargement. b. increase by external addition, or by accession of parts externally." There is a cross-reference to "accrue," which in turn is defined as "to come by way of increase or advantage; also, to arise or spring as a growth or result"; "to be added by ordered growth in process of time." The dividends in question are not accretions to the stock within these definitions, whose emphasis is upon organic growth, natural growth.
In Martindell v. Fiduciary Counsel, Inc., 133 N.J. Eq. 408, 414 (E. & A. 1942) the court said:
"Upon declaration, the dividend becomes instanter the property of the shareholder, although payable in the future. It is separate and distinct from the stock, and does not pass as an incident of the shares if sold before the payment of the dividend." (Italics ours)
"Accretions" were held not synonymous with "dividends" under the facts of Revloc Supply Co. v. Troxell, 281 Pa. 424, 126 A. 774 (Sup. Ct. 1924). The written agreement between the parties there provided that if defendant left plaintiff's employ, the company would within 30 days repurchase certain shares of its corporate stock he had bought from it, at the price he paid. Until such time as the company repurchased the stock, defendant was to receive "all the income, dividends and accretions thereof." The Pennsylvania Supreme Court agreed with the court below that "accretions" means an *303 increase by natural growth and signifies something more than "dividends." As used in the agreement, it was deemed to embrace the surplus earnings of the corporation. Defendant was held entitled to his proportionate share of the undivided net earnings.
Plaintiff cites In re Ferguson's Trust, 354 Pa. 367, 47 A.2d 245, 165 A.L.R. 772 (Sup. Ct. 1946), as authority for the proposition that "accretions" embrace dividends. That conclusion must strictly be limited to the facts of the case. By Item 1 of his deed of trust, the settlor left 500 shares of stock in trust, directing the trustee to collect "all such dividends, accretions, profits or benefits of every kind whatsoever as may be declared, become due and be payable upon or account of said shares," and to "expend such dividends" for the benefit of the life tenants. Item 2 directed that upon the termination of the trust the shares go to a church, "together with all accretions, additions and accumulations thereto and thereon." Item 3 provided that in the case of "any accretion or accretions by way of extra dividends, increase of capital stock inuring to the benefit of the stockholders, or otherwise, the same shall be added to and form part of the principal fund and held by the Trustee." The court construed the word "accretion," in the light of Item 3, as embracing the stock dividends and stock subscription rights there in question. It rejected the contention of the life tenants that this property should go to them under Item 1 of the trust deed, holding, 354 Pa. at page 372, 47 A.2d at page 248:
"* * * it is clearly evident from a comparison of the two items that settlor recognized a difference between ordinary dividends, which are indisputably income, given to the life tenants by Item 1, and `accretions' such as `extra dividends, increase of capital stock inuring to the benefit of stockholders' * * *."
An ordinary cash dividend is separate and distinct from the stock, and not part of its "organic growth" or "enlargement." A stockholder's claim to such dividend is not an accretion on *304 his stock in the legal sense; it is a claim which may be assigned separately from the stock.
The first section of the Escheat Act, N.J.S.A. 2:53-15, includes not only stock but every other kind of personal property. Accordingly, the word "accretions" is not necessarily without legal effect in a proper case, even though it be held that the word does not include ordinary cash dividends. Such construction does not nullify its significance in the surrounding text. For example, a stock dividend might be held to be an "accretion" upon an original share, as might subscription rights.
The obvious fact here is that dividends declared within the 14-year period preceding the filing of the complaint have not gone unclaimed for a full 14 years. It cannot therefore reasonably be urged that they have been abandoned, or that they may be presumed to have been abandoned. Accordingly, declared dividends that have not been in existence for the statutory period may not be escheated on the theory that they are "accretions" on the original unclaimed and escheatable shares of stock.

VI
The answer filed December 10, 1948 listed, among other things, 90 shares of defendant's common stock, the whereabouts of whose owners had been unknown for 14 years. These shares were no-par stock, having a stated value of $75 the share. In 1949 the stated value was increased to $100 the share, and each share of common stock was split into three parts. The procedure followed by the defendant was to send each stockholder of record on the date the split became effective, a new certificate for twice the number of shares represented by his old certificate. Thus, after the split, each of the original outstanding certificates represented the same number of shares, but with a stated value of $33-1/3 instead of $75, and each stockholder was entitled, as long as he retained the original certificate, to another certificate for *305 additional shares twice the number of those represented by the original certificate.
Defendant admits that the published notice properly stated the numbers of the certificates which the State wants to escheat, as well as the names of the owners of record and the number of shares represented by each such certificate. However, it contends that the published certificate numbers were those of the original certificates, and that no notice whatever was published with respect to the additional certificates to which each owner of stock became entitled upon the effective date of the stock split-up. It therefore claims that there can be no escheat as to these last-mentioned shares without the State publishing a supplemental notice in which the additional certificates will be set forth.
In support of this argument defendant relies upon State v. Standard Oil Company, 5 N.J. 281, 307 (1950) where it said:
"* * * And it is implicit in the statute that the notice shall identify the property of which escheat is sought and the last known owner. That is of the very nature of the notice thus prescribed."
The claim, in brief, is that the notice definitely identified, not the property sought to be escheated with respect to unclaimed or allegedly abandoned common stock, but only one-third thereof.
The published certificate numbers were the numbers given in the answer, and the shares listed under the several certificate numbers were those listed in the answer under such certificate numbers. The only other person to whom the property must be identified is the owner. To him the certificate, whose number is set forth in the answer and in the published notice, represents what it represented when issued  the original shares of stock. These shares, in turn, represent the owner's proportional interest in the defendant corporation, its capital and net earnings. 18 C.J.S., Corporations, § 194, p. 620. That proportional interest was not affected by the split.
*306 True, defendant informed stockholders whose whereabouts were known to it that their stock had been split three-for-one, that their old certificates stood for one-third of the new shares into which their old shares were split, and that the new certificates which it sent them represented the other two-thirds. It did not so inform the persons listed in the answer and in the published notice, because their whereabouts were unknown to it. Had the notice come to the attention of such owners, it would have informed them that the shares of stock under specific certificate numbers respectively belonging to them were the subject of this proceeding. Upon presenting his certificate, an owner would be entitled to receive all that it represented. Defendant never changed the identification in the owner's mind, whatever it may have done in its own corporate mind.
It should be pointed out in passing that plaintiff first learned of the split when the stipulation of facts was entered into. This happened after the notice was published and after the date fixed for hearing. It was then that defendant for the first time informed plaintiff of the procedure which it had followed in connection with the split.
Defendant cannot defeat the State's right to escheat all the shares represented by the original certificates.
There will be a judgment of escheat for all the unclaimed dividends and shares here involved, except for the dividends declared during the 14-year period preceding the filing of the complaint on the escheatable shares now in defendant's possession, and except, further, for the dividends and shares heretofore paid or transferred to claimants pursuant to the provisions of the court orders of September 13, 1951, and November 13, 1951.
NOTES
[1] A detailed schedule filed by defendant, entitled "Preferred and Common dividends payable prior to November 3, 1934 but unpaid November 18, 1948, exclusive of dividends paid out under court order dated September 13, 1951," lists these dividends, under preferred and common dividend categories and according to New Jersey stockholders and other-than-New Jersey stockholders, giving the name and last-known address of the stockholders and the total amount of dividends due them. These dividends are analyzed under the following headings: "Mailed, not Cashed," "Held, not Mailed," and "Mailed and Returned." As of October 11, 1951 the totals under these headings were $171,418.09, $119,774.64 and $17,037.81, respectively. These amounts were somewhat reduced by subsequent payments made by defendant under court order.
[2] Of the dividends included in Schedule A, about 60 per cent were represented by checks not returned by the postoffice, yet never presented for payment. The rest were represented by checks returned by the postoffice and the subsequent checks for the same stockholders withheld by the company. A statement filed by defendant on December 7, 1951 shows that pursuant to court orders of September 13 and November 13, 1951, defendant paid to persons who, it was satisfied, were originally entitled thereto, or to their successors in interest, claims presented on preferred stock checks totalling $78,079.40, and on common stock checks totalling $81,240.31, or a grand total of $159,319.71. These payments are through December 1, 1951. They include hundreds of New Jersey residents and many hundred persons residing throughout the United States and abroad, particularly in England and France.
[3] On December 7, 1951 defendant filed its statement of shares of stock transferred by it, pursuant to authority granted by the court orders of September 13 and November 13, 1951, to persons who, defendant was satisfied, were those orginally entitled to such shares, or their successors in interest. With respect to common stock, the additional shares resulting from the 1949 three-for-one split were dealt with in the same manner as the original shares. With respect to both preferred and common stock, claims on unpaid dividend checks were paid to the person or persons found to be entitled to the stock. The statement shows that 52 shares of common stock and 4 of preferred, represented by 22 separate stock certificates, were transferred to 15 different stockholders. Their addresses were Alabama, Austria, California (2), China, Colorado, Illinois, Minnesota (3), New York and Pennsylvania (4).